(C. D. 848)

ROCHE-ORGANON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 29, 1944)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Eugene A. Chase* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Joseph B. Brady, Robert C. O'Grady,* and *Richard F. Weeks,* special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: The distinction to be drawn, for tariff purposes, between a medicinal preparation and a drug has been the subject of several recent cases before us. In all of them, the importer sought to obtain classification as a drug, basing such claim on the premise that the merchandise under consideration, in its imported condition, required further processing before application as a therapeutic agent for medicinal purposes. In support thereof, testimony was introduced of expert witnesses familiar with the processing of the product in the country of exportation and the subsequent adjustments made in the laboratory of the importer. The substance of our conclusion in differentiating between the two tariff terms in issue is that the term "drug" relates only to a substance or material useful for medicinal purposes, and a "medicinal preparation" is a product, with therapeutic qualities, ready for medicinal use. In applying this rule, the medicinal value of the imported product has been the controlling factor. If it possessed sufficient therapeutic properties, at the time of importation, and underwent no chemical change between then and its ultimate medicinal use, it met the statutory meaning of a medicinal preparation. That it was compounded with some inert substance after importation, to facilitate its application, did not affect this conclusion. The rule was first applied in *Synthetic Patents Co., Inc.* v. *United States,* 11 Cust. Ct. 98, C. D. 803, holding a pancreatic hormone to be a medicinal preparation, and has been followed in several subsequent cases, i. e., *Synthetic Patents Co., Inc.* v. *United States,* 11 Cust. Ct. 147, C. D. 813, classifying cholic acid as an advanced drug; *Synthetic Patents Co., Inc.* v. *United States,* 11 Cust. Ct. 157, C. D. 816, holding a protein hormone, known as chorionic gonadotropin, to be a medicinal preparation; and *Synthetic Patents Co., Inc.* v. *United States,* Protests 65451–K, 12 Cust. Ct. 148, C. D. 845, involving tachysterol and vitamin $D_3$, sustaining the importer's claim of the former as an advanced drug, and upholding the collector's classification of the latter as a medicinal preparation.

The instant case presents the identical issue and is very definitely controlled by the construction applied in all of the cited cases. Here, plaintiff imported a commodity invoiced as "Oestrone crystals (urine concentrate)," which the collector classified as a medicinal preparation under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), assessing duty thereunder at 25 per centum ad valorem. The classification urged by plaintiff is that of a drug, either free of duty under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669) as being in a crude state, or dutiable at 10 per centum ad valorem under paragraph 34 of the said act (19 U. S. C.

1940 ed. § 1001, par. 34), as having been advanced in condition. Other claims in the protest were not pressed, either at the hearing or in the brief.

Samples of the imported merchandise, as it is received in this country and as sold commercially, were put in evidence by plaintiff, a corporation engaged exclusively in preparing hormones for commercial distribution. Defendant introduced tablets prepared with the use of the imported commodity and illustrative charts showing the effect on humans from the use of the merchandise. The original exhibits were destroyed by fire in the sample bureau of the court. Some, particularly the illustrative charts, are irreplaceable. While they were helpful in presentation of the case, their presence is not regarded as essential for a proper determination of the issue.

We look first at the evidence produced by witnesses for plaintiff, both of whom are in its employ. Dr. Bernard Joseph Brent, scientific director, who has "supervision of scientific research and of manufacturing," offered some explanation concerning the source of the imported product, and described in detail the treatment applied thereto by his firm in producing commercial preparations containing the same. The imported commodity consists of equilin, equilenin, hippulin, possibly some estradiol, coloring matter, and "about 90 per centum oestrone," all of such substances being hormones. The desired product is the estrogenic hormone for its therapeutic properties capable of correcting conditions peculiar to females. It is obtained from urine of pregnant mares collected between the sixth and ninth month of pregnancy that extends over 11 months. The selected period is the time when the hormone excretion is at its highest. Although the witness was thoroughly familiar with the procedure followed to acquire the imported merchandise, having observed it during his 4 years' experience with the foreign producer in Oss, Holland, and being in possession of "the procedure of manufacture," he refused to describe what he admitted to be a highly involved and complicated process, stating, "I do not know whether I am at liberty to do so, because the company has a procedure of its own which has not been described in the literature yet and I don't think I am at liberty to divulge the process." Only a sketchy outline was given, consisting merely of a statement that the urine is acidified by adding a mineral acid and ultimately concentrated to form "a tarry, brown, foulsmelling mass which is further repurified by the use of organic solvents, and at a certain point this purification is stopped." The preference to withhold details has resulted in an important omission from the line of proof highly pertinent to the claim advanced by the plaintiff.

After importation, the merchandise is biologically assayed in the laboratory of the importer. Injections are given to approximately

50 spayed mice and the results are compared with those obtained from the use of a recognized international standard. The instant merchandise was found to contain "8.8 million international units to the gram." In response to the court's question, "How do you determine international units?", the witness stated (p. 29), "By comparing it with the activity of that international standard, or the standard powder of the United States Pharmacopoeia, which is also expressed in international units, so we inject some of the mice with that international or United States Pharmacopoeia powder, and other mice with the sample which we want to analyze, and compare the vaginal smears obtained in each group with those of the standard material, and that which gives us the same degree of cornification as the certain amount of the standard material gives us, contains the same amount of international units. This is the officially advised method of standardization as advised by the League of Nations and the United States Pharmacopoeia." A chemical test of the imported merchandise—finding the melting point and optical rotation— disclosed that the "material is not pure oestrone."

The results of these tests form the basis for using the imported estrogenic hormone in the manufacture of four products, commercially marketed by the importer under the following labels: "Menformon Injections," collective exhibit 2; "Menformon Dosules," collective exhibit 3; "Kolpon Inserts," collective exhibit 4; and "Menformon Tablets," collective exhibit 5. In the preparation of these products, the imported merchandise is dissolved in an organic solvent, either acetone or ether, that is removed before the active hormone is mixed with an inert carrier, convenient for its commercial distribution. The particular substance used with the estrogenic hormone is dependent upon the form in which the hormone is to be commercially offered. For the injections, peanut oil is employed to dilute the solution to the desired concentration. When dispensed as "Menformon Dosules," the active principle is combined with animal fat and the mixture emulsified with "cholesterol, lanum, and petrolatum and water, and antiseptics and some perfume is being added." In tablet form, the estrogenic hormone has a milk-sugar base with the addition of "different starches and water" as auxiliaries for its application. The inserts consist of the active hormone with sodium phosphate and glucose, the combination having been vacuum dried and the resulting flakes broken into fine powder that is pressed to form the finished product. Sodium phosphate is used as a buffer salt, "to assist the estrogenic hormone in its activity," and tends to give the affected area a healthy condition more quickly for the active properties of the hormone. The chemical formula of the imported oestrone is in no way changed after it has been processed by the importing corporation to any of its commercial products.

Dr. Ralph D. Shaner, medical director of the importing corporation since 1932, was the other witness for the plaintiff. He has been familiar with the merchandise in question, and the preparations made therefrom by his firm, since 1937, as well as having administered such products as a practicing physician. His testimony on direct examination relates largely to the use of the four commercial labels under which the imported commodity is marketed by his employer, and might be briefly summarized as follows: all of the products mentioned are offered for the treatment of deficiencies in the estrogenic hormone in females, the principal group of such ailments being menopause disorders. Some use is made to relieve inflammation of the breasts. The injections are administered intramuscularly, using a hypodermic needle to penetrate the skin; the dosules are applied cutaneously, as an ointment, to the affected area; the tablets are taken orally; and the inserts are "vaginal tablet suppositories." The use of two forms is a frequent practice to maintain the desired effect. Three pamphlets, collective exhibit 6–A, 6–B, and 6–C, were identified as representative of the literature sent by the importer to physicians for their use in administering the said products. The average physician would not apply the imported merchandise "because he has no means of obtaining a dose which would not be harmful," and the use of improper dosages would cause "overstimulation of those tissues that are responsive to the effect of the oestrogens," resulting in serious ill effects to the patient. The conclusion that the instant merchandise is not a medicinal preparation is based on the view that it is essential to know the proper dosage of any product before attempting to classify it as a medicinal preparation.

The witness' attitude on cross-examination was not impressive. His answers were evasive and he appeared reluctant to supply complete information to support opinions expressed. He admitted that the only active principle in the commercial products of plaintiff is the imported merchandise, inert solvents or vehicles being used in preparing proper dosage. He stated that the imported hormone could not be administered orally in all cases for which it has application, referring specifically to the large quantities required in "severe manifestations of the menopause," where oral dosages would create harsh reactions. His testimony concerning the use of sodium phosphate has a contradictory phase. He stated that the use of such substance in the inserts "concerns itself with the maintenance of vaginal acidity" and added "that is one of the effects we are striving to obtain," yet further testimony contains the admission that no substitute for the sodium phosphate is used when the estrogenic hormone is administered intramuscularly or orally, although the injections and tablets treat the same diseases as the inserts. It was finally conceded that

the same result is obtained "a little more slowly" without the use of the buffer salt.

Dr. Ephraim Shorr, eminently qualified, was the sole witness for the defendant. He is Associate Professor of Medicine in Cornell Medical School, associate attending physician in New York Hospital, chief of the Endocrine Clinic at New York Hospital, and chief of the department of metabolism of New York Hospital. He has specialized in endocrinology and diseases of metabolism, "such as diseases of the thyroid, diseases of the sex glands, diseases of the pituitary, diseases of the parathyroid, all of the ductless glands that are of major importance for the maintenance of bodily function, not the infectious diseases, metabolic disturbances." He has been consulted frequently by several well-known pharmaceutical concerns, including the plaintiff, engaged in the manufacture of hormone products, has set up standards for endocrine preparations for the United States Food and Drug Administration, and has advised the Pharmacopoeial Committee of methods for standardizing hormones, particularly the estrogens.

His experience in diseases of the ductless glands was described as "my life's work," adding that "most of my emphasis in the human has been on the ductless glands related to the female sex hormones," a ductless gland being defined (p. 101) as one "whose secretion does not empty directly into the intestines. * * *. They secrete their product directly into the blood stream, and they secrete what we know as hormones. These hormones are variously defined. As we have gotten to know more about them we have shifted our definition. In essence they are chemical substances which are carried to various parts of the body and act in other parts of the body than in the part in which they are produced." The vaginal smear—for diagnosing and controlling treatment for deficiencies of the estrogenic hormones in females—developed by him has been accepted as an objective guide and a therapeutic index on the influence of such hormones in humans.

Dr. Shorr testified that the merchandise in question was imported as impure oestrone for two reasons, to wit, to avoid infringement on patents controlling the pure crystalline product, and for economic purposes. He further stated that the imported product is exclusively used for medicinal purposes, having therapeutic qualities that remedy biological and physiological conditions in females caused by deficiencies in the estrogenic hormone, that it will develop female characteristics in immature girls and relieve menopause disorders, and that such results can be obtained from oral administration of the hormone under consideration; in fact, the use thereof through the mouth leads to "maintenance of a uniform level of the hormone in the organism." It is the economical problem that introduces the use of other modes of administration, being the reason for the intramuscular method as the one most frequently adopted.

We refer now to specific extracts in support of witness' statement that the manipulations of the instant merchandise, after its importation, in no way affect its essential characteristics as a therapeutic agent. The mixing of the active principle with inert substances (p. 120) "provided vehicles for a variety of modes of administration, but the oestrone itself is, when it enters the organism through any of those routes, exactly the oestrone that is in exhibit No. 1." The use of sodium phosphate in the preparation of "Menformon Inserts" (p. 137) "has no effect on the specific activity of the hormone." The buffer salt lends tolerance to the applied area but the medicinal value of the estrogenic hormone is not enhanced or affected in any manner. The witness explained it as follows (p. 137):

The hormone influence is apart from that vaginal epithelium in a certain characteristic way. And whether you have that in there or you do not have it in there, or you add another acid, or you have a vinegar douche does not make any difference, you are not affecting that hormone at all, nor is—you are not making the action of that hormone any greater. The action of that hormone is, by virtue of its estrogenic property, not by virtue of any of these changes.

Asked whether the presence of sodium phosphate added any therapeutic value, the witness answered (p. 138):

I have no reason to feel that it does. In other words, for you, or anyone, to say that the temporary acidity while the hormone is getting ready to do the real job of building up this epithelium is better than using the hormone alone, which most of us have done in this case—you would have to have a longer series of control cases in which you would say that this short period in between the effect of the hormone and building up of this mucosa, this short and brief and not sustained period of acidity is due to this extraneous material added to your ampul, has improved the speed of recovery by a day or by 2 hours; no such series exists. All of the effects that have been produced fundamentally have been aimed to make a more, a thicker cornified vaginal epithelium. You can do it by mouth, you can do it by injection, you can do it intravaginally. That is the essence of it. Now, if you wish to distinguish your product, let us say, by some nicety that is—well, I do not think it is relevant, if I may say so, to the point at issue whether this deals with a specific action of this hormone, whether it influences the hormone at all. I would say, quite positively, that it has no effect on the hormone. * * *.

Prior to his appearance as a witness, Dr. Shorr was given, with the consent of both counsel, a quantity, approximately 200 milligrams, of the imported product, exhibit 1, and a supply—three packages containing 25 each—of "Menformon Tablets," collective exhibit 5. He used his amount of the imported merchandise to have tablets prepared by a pharmacist, under his supervision, in New York Hospital—each one containing approximately two milligrams of the active principle mixed with milk sugar. Under cross examination, the method followed in preparing the tablets was described as follows (p. 132): "he [the pharmacist] employed the usual procedure which pharmacists employ to make capsules. They use an inert carrier, and with most of them lactose milk sugar is a favorite. They will frequently use a little

dye so as to help to see how well this is mixed. Then they will take a definite amount. * * *. He just mixes that until that is thoroughly mixed. He then fills the tablet, and will fill all the rest of the tablets accordingly, so that these tablets correspond, therefore, to 1/100 of the total dose given him. He was given 200 milligrams, approximately, and he used up all of the material in making up these 100 capsules." The use of different carriers "is economically desirable to employ short cuts so that the drug can be provided to the physician in the proper dosage," the average physician being unable to easily mix such preparations because the matter of dosage is fixed according to the Pharmacopoeia standards which are more readily available to manufacturers and pharmacists for obvious reasons.

The tablets prepared by Dr. Shorr, along with his supply of the "Menformon Tablets," were used by him in treating patients with deficiencies in the estrogenic hormone. His description of the effects from the use of both quantities was graphically illustrated with the use of charts and slides showing conditions before and after the administration of the oestrones. The conclusion is very definite that the merchandise in question possesses inherent medicinal value sufficient for adjustments in females comparable to those accomplished by the natural estrogenic hormone. The greater replacement therapy obtained from the tablets prepared by the witness was due to the larger dose contained therein over the amount used in the importer's product, a result supporting testimony that variable dosages are required for different conditions.

Plaintiff contends that the imported merchandise did not reach the status of a medicinal preparation because it required processing, with consequent adjustments, before it could be administered by a physician. In his brief, counsel has cited the *Synthetic Patents Co., Inc.*, case, C. D. 803, *supra*, and has included in the quotation therefrom our statutory interpretation of a medicinal preparation as "a product with therapeutic qualities ready for medicinal use." It is argued that the words "ready for medicinal use" refer to the time when the importation is "in a form in which it can be used by a physician or by the ordinary corner druggist." The brief continues "In other words, the complexity of the requisite treatment in this country before the product is ready for use should determine the degree of advancement of the imported merchandise."

The use of the language "ready for medicinal use" should not be so applied, as suggested by plaintiff's counsel, to support a theory clearly contrary to that expressed in the cited case. Because an imported product has not been subjected, before shipment, to certain associations ultimately leading to the admitted conclusion that what has been done merely permits the release of the very same product by some commercial enterprise under labels acceptable to certain trade

privileges, is an attempt to masquerade the active medicinal and invoke a method to confuse an otherwise simple interpretation of the provision in paragraph 5, *supra*. It would be a reflection upon the medical profession to announce that a preparation is only ready for medicinal use after a pharmaceutical establishment had embellished it with its own inertables, or a druggist would use it as a glossary to translate a perfectly simple medicinal prescription into a directed form.

To adopt plaintiff's suggested interpretation would not only be contradictory to the rule announced in the previous case referred to, but also would be contrary to decisions on which such statutory construction was based, as set forth in the cited case as follows:

In a line of decisions (*Battle & Co. Chemists' Corp.* v. *United States*, 108 Fed. 216; *McKesson & Robbins* v. *United States*, 3 Ct. Cust. Appls. 515, T. D. 33167; and *William Cooper & Nephews, Inc.* v. *United States*, 10 Cust. Ct. 247, C. D. 763), the courts have held imported merchandise properly classifiable as medicinal preparations where it was shown that the product in question required no chemical change or compounding with other medical ingredients, from its imported condition, for its medicinal use. That the merchandise was diluted or mixed with some inert carrier when administered, did not affect its tariff classification as a medicinal preparation. The chloral hydrate, subject of the litigation in the *Battle & Co. Chemists' Corp.* case, *supra*, was dissolved in water or sirup when administered to patients solely to provide a vehicle to convey it to the stomach. The menthol involved in the *McKesson & Robbins* case, *supra*, was obtained from processed oil, derived from the distillates of the peppermint plant. It was not generally used by itself but combined with some inert carrier, either in solution or as a salve. In our recent decision in the *William Cooper & Nephews, Inc.*, case, *supra*, derris resin compound, consisting of 12 per centum derris resin and 88 per centum an inert substance (clay) was reduced in strength after importation to make it commercially safe as the only active ingredient in animal insecticides. In all three cases, however, the therapeutic qualities of the product remained unchanged.

It has been consistently held that the therapeutic value of merchandise, at the time of its importation, controls its tariff classification as a drug or a medicinal preparation.

In the present case, all of the witnesses agree that the medicinal properties of the imported commodity remained constant throughout the treatment applied after importation, and that the active principle of the imported estrogenic hormone had not been changed from its original strength when offered under the commercial labels of the plaintiff. Since the therapeutic properties of the imported product are sufficient, without any other medicinal agent or ingredient, as a remedy for the conditions described herein, the instant merchandise is properly classifiable, within the cited decisions, as a medicinal preparation under paragraph 5, *supra*, as assessed by the collector.

The protest is overruled and the decision of the collector is affirmed.