(C. D. 1048)

ROCHE-ORGANON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 26, 1947)

*Eugene R. Pickrell* for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: "Drugs" and "medicinal preparations," in a tariff sense, are closely allied terms. Drugs are divided into two categories, i. e., those in a crude state, paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1669), entitled to free entry, and those advanced in value or condition, paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34), dutiable at 10 per centum ad valorem. The word "drug" is defined in the statute, paragraph 34, *supra,* as "those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes." The statutory provision for "medicinal preparations," paragraph 5 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 5) has been limited, by judicial interpretation, to articles whose chief use is for medicinal purposes, *United States v. Hillier's Son Co.,* 14 Ct. Cust. Appls. 216, T. D. 41706. The similarity between the two tariff provisions was expressed in *United States v.*

*Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038, as follows: "Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal."

While identical factors—therapeutic qualities and medicinal use—control the tariff classification of merchandise, either as a drug or a medicinal preparation, the very definite difference in treatment accorded the respective products in the tariff act indicates an understanding by Congress that a real distinction between them existed and was intended to be respected. In other words, Congress is presumed to have had good and sufficient factual basis for setting up such separate provisions and to possess in its records and files, making up the Congressional intent, convincing and sound reason therefor.

The foregoing serves to introduce the present issue. The instant case is a retrial of *Roche-Organon, Inc.* v. *United States*, 12 Cust. Ct. 164, C. D. 848, the record therein being incorporated by consent of the parties. The merchandise, admittedly the same in both cases, is invoiced here as "Urine Concentrate in form of R III-crystals." It was classified by the collector as a medicinal preparation under paragraph 5, *supra,* as amended by the trade agreement with Argentina (T. D. 50504), and assessed with duty at 12½ per centum ad valorem. Plaintiff seeks classification as a drug, either as crude under said paragraph 1669, *supra,* or as advanced in condition and therefore dutiable under paragraph 34, *supra.* The other claim in the protest, alleging classification as a nonenumerated, unmanufactured article, dutiable at 10 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, was not pressed, either at the hearing or in the briefs, and therefore no further reference will be made thereto.

The incorporated record consists of oral testimony of three witnesses, two of whom were employed by plaintiff. The third appeared on behalf of defendant. Plaintiff also introduced samples of the imported merchandise as it is received in this country and as it is sold commercially. Defendant produced tablets prepared with the use of the imported commodity and also offered illustrative charts showing the effect on humans from the use of the merchandise.

All of the original exhibits were destroyed by fire in the sample bureau of the court. Some, particularly the illustrative charts, are irreplaceable. While they were helpful in the presentation of the case, their presence is not regarded as essential for a proper determination of the issue. Duplicate samples of the imported merchandise, and as it is offered commercially, have been furnished and are referred to hereinafter.

A review of the evidence adduced in the incorporated case can well be supplied by a virtual restatement of our analysis of the proof in

the earlier case. A discussion of the additional testimony offered herein will then follow, applying its intended purpose toward any change it might dictate in the previously discussed factual record.

We do this with some confidence in its accuracy because in the retrial now before us, no criticism of our original factual findings is found in the briefs so ably and painstakingly prepared by counsel for the respective parties. The evidence in the previous case can be analyzed as follows:

Plaintiff corporation is engaged exclusively in the preparation of hormones for commercial distribution. Dr. Bernard Joseph Brent, its scientific director, who has "supervision of scientific research and of manufacturing," offered some explanation concerning the source of the imported product and described in detail the treatment applied thereto by his firm in producing commercial preparations containing the same. The imported commodity consists of equilin, equilenin, hippulin, possibly some estradiol, coloring matter, and "about 90 per cent oestrone," all of such substances being hormones found naturally in the urine of pregnant mares. The desired product is the estrogenic hormone for its therapeutic properties capable of correcting conditions peculiar to females. It is obtained from urine collected between the sixth and ninth month of pregnancy that extends over 11 months. The selected period is the time when the hormone excretion is at its highest. Although the witness was thoroughly familiar with the procedure followed to acquire the imported merchandise, having observed it during his 4 years' experience with the foreign producer in Oss, Holland, and being in possession of "the procedure of manufacture," he refused to describe what he admitted to be a highly involved and complicated process, stating, "I do not know whether I am at liberty to do so, because the company has a procedure of its own which has not been described in the literature yet, and I don't think I am at liberty to divulge the process" (referring obviously to what transpires before importation). Only a sketchy outline was given, consisting merely of a statement that the urine is acidified by adding a mineral acid and ultimately concentrated to form "a tarry, brown foul-smelling mass which is further repurified by the use of organic solvents, and at a certain point this purification is stopped." Controlling purification of the urine is for the specific purpose of avoiding conflict with a product in this country that is protected by the Allen and Doisy patent, covering one hundred per centum pure oestrone.

After importation, the merchandise is biologically assayed in the laboratory of the importer. Injections are given to approximately 50 spayed mice, and the results are compared with those obtained from the use of a recognized international standard. The instant merchandise was found to contain "8.8 million international units to the gram," or approximately 10 per centum less potency than the

recognized standard, so that in the manufacture of its commercial products, collective exhibits 2, 3, 4, 5, *infra*, plaintiff had to increase the gram weight of the active hormone. In response to the court's question "How do you determine international units?", the witness answered "By comparing it with the activity of that international standard, or the standard powder of the United States Pharmacopoeia, which is also expressed in international units, so we inject some of the mice with that international or United States Pharmacopoeia powder, and other mice with the sample which we want to analyze [meaning here the imported product], and compare the vaginal smears obtained in each group with those of the standard material, and that which gives us the same degree of cornification as the certain amount of the standard material gives us, contains the same amount of international units. This is the officially advised method of standardization as advised by the League of Nations and the United States Pharmacopoeia," an authority having in some respects the influence and dignity of law. The imported merchandise was also chemically tested—finding the melting point and optical rotation—showing that the "material is not pure oestrone," thus assuring plaintiff that its imported merchandise does not infringe upon the patented domestic product, containing one hundred per centum oestrone only.

The imported estrogenic hormone is used in the manufacture of four products, commercially marketed by plaintiff under the following labels: "Menformon Injections," collective exhibit 2; "Menformon Dosules," collective exhibit 3; "Kolpon Inserts," collective exhibit 4; and "Menformon Tablets," collective exhibit 5. In the preparation of these products the imported merchandise is dissolved in an organic solvent, either acetone or ether, that is removed before the active hormone is mixed with an inert carrier in definite proportions convenient for commercial distribution. The particular vehicle, used as a carrier with the estrogenic hormone, is dependent upon the form in which the hormone is to be commercially offered. For the injections, peanut oil is employed to dilute the solution to the desired concentration, from 1,000 to 10,000 international units per injection. When dispensed as "Menformon Dosules," the active principle is combined with animal fat and the mixture emulsified with "cholesterol, lanum, and petrolatum and water, and antiseptics and some perfume is being added." The dosules are offered in two strengths, i. e., 2,000 international units per dosule and 5,000 international units per dosule. In tablet form, the estrogenic hormone has a milk-sugar base with the addition of "different starches and water" as auxiliaries for its application. The tablets come in two degrees of strength, "1,000 and 10,000 International Units per tablet." The inserts consist of the active hormone with sodium phosphate and glucose, the

combination having been vacuum dried and the resulting flakes broken into fine powder that is pressed to form the finished product. Sodium phosphate is used as a buffer salt "to assist the estrogenic hormone in its activity," and tends to give the affected area a healthy condition more quickly for the active properties of the hormone. The inserts are produced in two sizes; those for children containing 500 international units each and the ones for adults having 1,000 international units. The chemical formula of the imported oestrone is in no way changed after it has been processed by the importing corporation to any of its commercial products.

Dr. Ralph D. Shaner, medical director of the importing corporation since 1932, testified that he has been familiar with the merchandise in question, and the preparations made therefrom by his firm since 1937, as well as having administered such products as a practicing physician. His testimony on direct examination relates largely to the use of the four commercial labels under which the imported commodity is marketed by his employer, and might be briefly summarized as follows: All of the products mentioned are offered for the treatment of deficiencies in the estrogenic hormone in females, the principal group of such ailments being menopause disorders. Some use is made to relieve inflammation of the breasts. The injections are administered intramuscularly, using a hypodermic needle to penetrate the skin; the dosules are applied cutaneously, as an ointment, to the affected area; the tablets are taken orally; and the inserts are "vaginal tablet suppositories." The use of two forms is a frequent practice to maintain the desired effect. Three pamphlets, collective exhibits 6–A, 6–B, and 6–C, were identified as representative of the literature sent by the importer to physicians for their use in administering said products. A medicinal preparation was defined by the witness "as a substance with a pharmacodynamic action of such a degree that doses can be obtained with devices at the disposal of the physician or the allied healing arts, nursing, or the pharmacist, that will do no harm," the witness expressing the opinion that the instant merchandise was not a medicinal preparation "because it is a substance that were you to put it in the office of the average practitioner, he would not dare apply it because he has no means of obtaining a dose which would not be harmful." The use of improper dosage would cause "overstimulation of those tissues that are responsive to the effect of the estrogens," resulting in serious ill effects to the patient. We will discuss this contention more in detail later.

The witness' attitude on cross-examination was not impressive. His answers were evasive and he appeared reluctant to supply complete information to support opinions expressed. He admitted that the only active principle in the commercial products of plaintiff is the imported merchandise, inert solvents or vehicles being used in pre-

paring proper dosage. He stated that the imported hormone could not be administered orally in all cases for which it has application, referring specifically to the large quantities required in "severe manifestations of the menopause," where oral dosages would create harsh reactions. His testimony concerning the use of sodium phosphate has a contradictory phase. He stated that the use of such substance in the inserts "concerns itself with the maintenance of vaginal acidity" and added "that is one of the effects we are striving to obtain," yet further testimony contains the admission that no substitute for the sodium phosphate is used when the estrogenic hormone is administered intramuscularly or orally, although the injections and tablets treat the same diseases as the inserts. It was finally conceded that the same result is obtained "a little more slowly" without the use of the buffer salt.

Dr. Ephraim Shorr, eminently qualified, was the sole witness for the defendant. He is associate professor of medicine in Cornell Medical School, associate attending physician in New York Hospital, chief of the Endocrine Clinic at New York Hospital, and chief of the department of metabolism of New York Hospital. He has specialized in endocrinology and diseases of metabolism, "such as diseases of the thyroid, diseases of the sex glands, diseases of the pituitary, diseases of the parathyroid, all of the ductless glands that are of major importance for the maintenance of bodily function, not the infectious diseases, metabolic disturbances." He has been consulted frequently by several well-known pharmaceutical concerns, including the plaintiff, engaged in the manufacture of hormone products, and has set up standards for endocrine preparations for the United States Food and Drug Administration, and has advised the Pharmacopoeial Committee of methods for standardizing hormones, particularly the estrogens.

His experience in diseases of the ductless glands was described as "my life's work," adding that "most of my emphasis in the human has been on the ductless glands related to the female sex hormones," a ductless gland being defined as one "whose secretion does not empty directly into the intestines. * * * They secrete their product directly into the blood stream, and they secrete what we know as hormones. These hormones are variously defined. As we have gotten to know more about them we have shifted our definition. In essence they are chemical substances which are carried to various parts of the body and act in other parts of the body than in the part in which they are produced." The vaginal smear—for diagnosing and controlling treatment for deficiencies of the estrogenic hormones in females—developed by him has been accepted as an objective guide and a therapeutic index on the influence of such hormones in humans.

Dr. Shorr testified that the merchandise in question was imported as impure oestrone for two reasons, i. e., to avoid infringement on patents controlling the pure crystalline product, and for economic purposes. He referred to the manipulations of the imported hormone in the laboratory of plaintiff after importation as "the usual assay which is required by the Food and Drug Administration and the Council of Pharmacy of the A. M. A." He further stated that the imported product is exclusively used for medicinal purposes, having therapeutic qualities that remedy biological and physiological conditions in females caused by deficiencies in the estrogenic hormone, that it will develop female characteristics in immature girls and relieve menopause disorders, and that such results can be obtained from oral administration of the hormone under consideration; in fact, the use thereof through the mouth leads to "maintenance of a uniform level of the hormone in the organism." It is the economical problem that introduces the use of other modes of administration, being the reason for the intramuscular method as the one most frequently adopted. Dr. Shorr regarded the instant merchandise as a medicinal preparation because, at the time of importation, it is "capable of exerting the specific effect intended without any alteration in itself," and he gave convincing reasons therefor.

We refer now to specific extracts in support of Dr. Shorr's statement that the manipulation of the instant merchandise, after its importation, in no way affects its essential characteristics as a therapeutic agent. The mixing of the active principle with inert substances "provided vehicles for a variety of modes of administration, but the estrone itself is, when it enters the organism through any of those routes, exactly the estrone that is in exhibit No. 1." The use of sodium phosphate in the preparation of "Menformon Inserts," collective exhibit 4, "has no effect on the specific activity of the hormone." The buffer salt lends tolerance to the applied area but the medicinal value of the estrogenic hormone is not enhanced or affected in any manner. The witness explained it as follows:

The hormone influence is apart from the vaginal epithelium in a certain characteristic way. And whether you have that in there or you do not have it in there, or you add another acid, or you have a vinegar douche does not make any difference, you are not affecting that hormone at all, nor is—you are not making the action of that hormone any greater. The action of that hormone is, by virtue of its estrogenic property, not by virtue of any of these other changes.

Asked whether the presence of sodium acid phosphate added any therapeutic value, the witness answered:

I have no reason to feel that it does. In other words, for you, or anyone, to say that the temporary acidity while the hormone is getting ready to do the real job of building up this epithelium is better than using the hormone alone, which most of us have done in this case—you would have to have a longer series of control cases in which you would say that this short period in between the effect

of the hormone and building up of this mucosa, this short and brief and not sustained period of acidity is due to this extraneous material added to your ampul, has improved the speed of recovery by a day or by 2 hours; no such series exists. All of the effects that have been produced fundamentally have been aimed to make a more, a thicker cornified vaginal epithelium. You can do it by mouth, you can do it by injection, you can do it intravaginally. That is the essence of it. Now, if you wish to distinguish your product, let us say, by some nicety that is—well, I do not think it is relevant, if I may say so, to the point at issue whether this deals with a specific action of this hormone, whether it influences the hormone at all. I would say, quite positively, that it has no effect on the hormone. * * *

Prior to his appearance as a witness, Dr. Shorr was given, with the consent of both counsel, a quantity, approximately 200 milligrams, of the imported product, exhibit 1, and a supply—three packages containing 25 each—of "Menformon Tablets," collective exhibit 5. He used this amount of the imported merchandise to have tablets prepared by a pharmacist, under his supervision, in New York Hospital—each one containing approximately two milligrams of the active principle mixed with milk sugar. Under cross-examination, the method followed in preparing the tablet was described as follows: "He [the pharmacist] employed the usual procedure which pharmacists employ to make capsules. They use an inert carrier, and with most of them lactose milk sugar is a favorite. They will frequently use a little dye so as to help to see how well this is mixed. Then they will take a definite amount. * * * He just mixes that until that is thoroughly mixed. He then fills the tablet, and will fill all the rest of the tablets accordingly, so that these tablets correspond, therefore; to 1/100th of the total dose given him. He was given 200 milligrams, approximately, and he used up all of the material in making up these 100 capsules." Administration by mouth is the preferred method "because of its convenience and the ease of maintenance of a uniform level of hormone in the organism," and all the effects of this particular hormone under consideration can be obtained through oral administration. The use of different vehicles "is economically desirable to employ short cuts so that the drug can be provided to the physician in the proper dosage * * * and inert carriers are, therefore, used to make that possible." The matter of dosage is fixed according to pharmacopoeial standards which are followed by manufacturers and pharmacists in dispensing the products offered and sold by them.

The tablets prepared by Dr. Shorr, along with his supply of the "Menformon Tablets," were used by him in treating patients with deficiencies in the estrogenic hormone. His description of the effects from the use of both quantities was graphically illustrated with the use of charts and slides showing conditions before and after the administration of the estrones. The conclusion is very definite that the merchandise in question possesses inherent medicinal value sufficient

for adjustments in females comparable to those accomplished by the natural estrogenic hormone. The greater replacement therapy obtained from the tablets prepared by the witness was due to the larger dose contained therein over the amount used in the importer's product, a result supporting testimony that variable dosages are required for different conditions.

We now examine the new record made in this case. Supplementing the evidence in the incorporated record, as hereinabove outlined, plaintiff introduced the testimony of Dr. William Wolf, a specialist in endocrinology, i. e., the study of the function and action of the ductless glands, which are organs manufacturing secretions known as hormones that are poured directly into the blood stream, as distinguished from salivary glands whose secretions are poured into a surface. He has written several scientific articles on hormones and their uses and has acted as consultant for manufacturers of hormone preparations, advising them concerning the use of estrogens as ointments. He was consulted by the Food and Drug Administration on "the use of estrogens as ointments."

In the practice of his profession, he has prescribed and administered to males and females several types of hormones, including the kind under consideration which he recognized under the trade label "Menformon." He used the "Menformon" products, i. e., ampoules, dosules, inserts, and tablets as remedies for menstrual disturbances and hormone deficiencies in females and for glandular disorders in males. Although he testified that his prescriptions of or treatment with such products varied in dosages from 1,000 international units to 100,000 international units, depending upon the condition to be alleviated, no explanation was offered as to how he knew or learned the particular dosage being administered. Whether he prepared a dosage or accepted someone else's label, is not disclosed by the record.

His understanding of a medicinal preparation is materially different from the opinion expressed by the Government's witness, Dr. Shorr. Dr. Wolf defined a medicinal preparation as "a substance which is used for therapeutic purposes; in the form in which it is presented to the doctor or the patient or druggist." Giving the basis for such definition, he testified as follows: "Because it would be necessary to have the material in proper form and dosage. Since a physician's office is not equipped to apportion the right amount for each dose administered to the patient, no physician has equipment to weigh or divide a powder into small quantities. Since the doses are so very small, one of the larger doses is no more than a milligram, which is a thousandth of a gram, and a gram is one twenty-fifth of an ounce, and if one were to dose haphazardly, considerable damage might be produced, and neither the patient nor the physician would be fairly handled."

It is clear that the present merchandise possesses therapeutic properties and is used exclusively for medicinal purposes. Hence, it meets requirements for classification, either as a drug or a medicinal preparation, *United States* v. *Wm. Cooper & Nephews, Inc., supra.* The distinction, for tariff purposes, between the two kinds of merchandise was the subject of a line of cases, *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803, holding a pancreatic hormone to be a medicinal preparation; *Same* v. *Same*, 11 Cust. Ct. 147, C. D. 813, classifying cholic acid as an advanced drug; *Same* v. *Same*, 11 Cust. Ct. 157, C. D. 816, holding a protein hormone, known as chorionic gonadotropin, to be a medicinal preparation; and *Same* v. *Same*, 12 Cust. Ct. 148, C. D. 845, involving tachysterol and vitamin $D_3$, and which sustained the importer's claim of the former as an advanced drug, and upheld the collector's classification of the latter as a medicinal preparation. The legal principle, enunciated in the first of said cases and followed in the remainder, is that the term "drug" connotes a substance or a material useful for medicinal purposes, and a "medicinal preparation" is a product, with therapeutic qualities, ready for medicinal use. In applying that rule the medicinal value of the imported product has been the controlling factor. If it possessed sufficient therapeutic properties at the time of importation, and underwent no chemical change between then and its ultimate medicinal use, it met the statutory meaning of a medicinal preparation.

The basic statutory construction announced in the *Synthetic Products Co., Inc.* cases, *supra*, is accepted in the briefs before us, but plaintiff contends that in determining whether merchandise is a medicinal preparation the words "ready for medicinal use" should be construed as applying to the time when the commodity is ready for the use of an apothecary or by a physician to be administered as a remedy for disease. Counsel for plaintiff, in his brief, argues the contention this way:

> The basis of the plaintiff's claim herein is that the imported merchandise is not *ready* for medicinal use. Does it make any difference whether the treatment after importation is one of purification, one of chemical modification, one of mixing with other therapeutic agents, or one of carrying out a careful and extensive preparation and assay to put the article in a form ready for medicinal use? The essential element in each is that the importation is not in a form in which it can be used by a physician or by the ordinary corner druggist. In other words, the complexity of the requisite treatment in this country before the product is ready for use should determine the degree of advancement of the imported merchandise.

To support such contention, plaintiff relies greatly upon *Fink* v. *United States*, 170 U. S. 584, decided as early as May 23, 1898, wherein the court stated that "The commercial meaning of the term 'medicinal preparation' is the same as its ordinary meaning, viz, a substance used solely in medicine and prepared for the use of the apothecary or physician to be administered as a remedy in disease." The case

involved muriate of cocaine in crystals, which the collector classified as a chemical salt under paragraph 76 of the Tariff Act of 1890, and which the importer claimed to be a medicinal preparation under paragraph 74 of the said act. The court found that "Muriate of cocaine is dispensed in the form in which it is imported, or more often reduced therefrom to a powder by means of a mortar and pestle, or diluted in water or admixed with inert or neutral matter," and that it was used for medicinal purposes. The court held the merchandise to be classifiable as a medicinal preparation, saying that it was "made as such and solely used as a medicine."

*United States* v. *Merck & Co.*, 136 Fed. Rep. 817, which arose under the Tariff Act of 1897, citing the *Fink* case, *supra*, excluded from classification as a medicinal preparation a commodity known as "gaduol," an extract of cod-liver oil, the court concluding that "Gaduol, in the form in which it is imported, is not prepared for the use of the apothecary or physician, and is not dispensed in said form."

Other cases cited by plaintiff, *Hirzel et al.* v. *United States*, 58 Fed. Rep. 772; *United States* v. *Roessler & Hasslacher Chemical Co.*, 79 Fed. Rep. 313; *A. Klipstein & Co.* v. *United States*, 167 Fed. Rep. 535; *Scharf Brothers Co., Inc.* v. *United States*, 25 C. C. P. A. 32, T. D. 49038, tend to support the well-established principle that chief use for medicinal purposes is an essential element in fixing tariff classification as a medicinal preparation. A detailed review thereof is deemed unnecessary.

Much of the briefs of plaintiff's counsel is devoted to the legislative discussion relating to the provision for "medicinal preparations," as enacted in the Tariff Act of 1909, following the decision in the *Merck* case, *supra*. Analysis of such discussion concerning the proposed paragraph (finally appearing as paragraph 65 of the Tariff Act of 1909) covering "medicinal preparations" discloses that when the bill (H. R. 1438) was originally reported in the House, the proposed paragraph embodied language intended to include articles "ready for use of the apothecary or the physician, or requiring only a solvent or a diluent to be ready for such use." Aside from the fact that such phraseology was included in a proviso that was entirely stricken by the Senate (Congressional Record, vol. 44, part 2, p. 1899), and was not restored in the revised proviso (Congressional Record, vol. 44, part 5, p. 4759, amendment 90), ultimately enacted as part of paragraph 65 of the Tariff Act of 1909, it is most important to observe that the said language referred specifically to a group of terms, i. e., "alkaloids, balsams, chemicals, drugs, extracts, medicinal substances, oils, salts, or similar substances whatever, used for medicinal purposes," and was not directed to the specific provisions for "medicinal preparations."

The question before us concerns the tariff term "medicinal preparations," paragraph 5, *supra*, and our consideration of the present case must be directed entirely in the light of judicial interpretation of that term. We find nothing from the legislative history discussed by plaintiff to influence determination of the present issue.

There is a line of decisions, subsequent to the *Merck* case, *supra*, holding merchandise to be medicinal preparations, where it was found that the imported product, possessing therapeutic qualities, was merely diluted or mixed with an inert carrier when administered for its medicinal use. This judicial interpretation was first adopted in *McKesson & Robbins* v. *United States*, 3 Ct. Cust. Appls. 515, T. D. 33167, which arose under the Tariff Act of 1909. The same principle was followed in *United States* v. *Hillier's Son Co.*, *supra*, which arose under the Tariff Act of 1922, and it was reiterated in *United States* v. *Wm. Cooper & Nephews, Inc.*, *supra*, to which the provisions of the Tariff Act of 1930 applied. Thus the uniform statutory construction maintained in the three said cases was carried through three different tariff acts, including the present one under which the instant case arises.

The menthol, subject of the litigation in the *McKesson & Robbins* case, *supra*, was obtained from processed oil derived from the distillates of the peppermint plant. It was imported in bulk and sometimes refined, but frequently used without any refining with some inert carrier either in solution or as a salve. The *Hillier's Son Co.* case, *supra*, involved scammony resin obtained from shredded scammony root by percolating it with alcohol and then precipitating the resin by means of water. As imported, it was in small pieces contained in tins, each tin containing approximately 100 pounds. In its chief use, as a cathartic, the scammony resin was mixed with inert fillers, i. e., starch or glucose. The *Wm. Cooper & Nephews, Inc.* case, *supra*, concerned "derris resin or extract." The court commented that the "evidence produced is not very satisfactory," but, giving the collector's classification its recognized presumption of correctness, found that the involved resin possessed therapeutic properties, and that it was not necessary to compound the resin with other ingredients to make it useful as a medicinal preparation in insecticides.

Plaintiff argues that the three cases just reviewed are distinguishable from the present one because "the subjects of these cases are simple medicinal substances and were administered medicinally after simple compounding processes with inert carriers," whereas the instant merchandise is a "chemical compound of intricate molecular structure" that must be treated for purity and potency before it can be used.

We find nothing in the three cited cases indicating, in any way, that the court's conclusion was based on the fact that the involved products were "simple medicinal substances," as suggested by plaintiff. On

the contrary, the *McKesson & Robbins* case, *supra*, very definitely held in effect that a product, whether simple or complex, which requires no chemical change and no compounding with other medical ingredients to make it useful as a medicinal, did not take it out of the category of medicinal preparations. In the *Hillier's Son Co.* case, *supra*, which followed the statutory construction adopted in the said *McKesson & Robbins* case, the court emphasized its earlier judicial pronouncement by stating that the decision in the *McKesson & Robbins* case "plainly rested upon the proposition, which was fully discussed in the opinion, that the merchandise was in fact a medicinal preparation, and that the necessity of mixing inert carriers therewith in order to make it available for use as a medicinal preparation did not 'result in taking it out of the category of medicinal preparations'."

The legal principle, expounded in the *McKesson & Robbins* and *Hillier's Son Co.* cases, *supra*, was followed in the *Synthetic Patents Co., Inc.* cases, *supra*, distinguishing the terms "drug" and "medicinal preparations," and the same principle has equal force and effect in our disposition of the instant case.

The crux of the present issue is the effect to be given to the manipulation by plaintiff of the merchandise in question after importation. Are the chemical tests and biological assay applied in plaintiff's laboratory necessary as a prerequisite before the desired estrogenic hormone can be accepted as *ready for medicinal use*? Counsel for plaintiff, seeking to answer the question in the affirmative, argues, in his reply brief, as follows:

\* \* \* The plaintiff herein does contend that when it is necessary to test an imported product by ascertaining its melting point and optical rotation in order to determine its purity, and then make a biological assay which takes over three weeks, in order to ascertain its hormone potency, then, after these facts are ascertained, put it through highly technical processes under antiseptic conditions, so as to make therefrom medicinal preparations containing minute dosages that are prescribed only by the physician, such imported product is not a medicinal preparation.

We look to the reasons for plaintiff's interest in ascertaining the degrees of purity and potency of the imported commodity. First of all, it should be emphasized that purification of the estrogenic hormone under consideration is controlled by the foreign manufacturer, and that the importer desires an impure product to avoid infringement on a patented domestic article that is one hundred per centum pure estrone. There is no intent by plaintiff, in its determination of the melting point and optical rotation of the imported merchandise, to further purify it or change its therapeutic properties or enhance its medicinal value. On the contrary, its definite purpose is to insure a level of impurity, the maintenance of which in no way affects the active principle of the desired imported estrogenic hormone. The

chemical tests, following importation, are actually protective measures, assuring to plaintiff the right to pack, label, and ultimately market, as it does, under its trade name "Menformon," a "NON-CRYSTALLINE ESTRONE in natural combination with insignificant quantities of OTHER NATURALLY OCCURRING FEMALE SEX HORMONES," collective exhibits 2, 3, 4, and 5. Such treatment does not determine the outcome of the present issue.

The Federal Food, Drug, and Cosmetic Act (21 U. S. C. § 321) defines the term "drug" as follows:

Definitions; generally.

(g) The term "drug" means (1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3); but does not include devices or their components, parts, or accessories.

It is clear from the foregoing statutory definition that the use of the word "drug" in the said act includes medicinal preparations.

The United States Pharmacopoeia, also recognized in the Federal Food, Drug, and Cosmetic Act, *supra*, provides "Reference Standards" as a basis of comparison for official assays. This important medical document is an official compendium to guide interested parties in the preparation and distribution of their products. We know of no other privately edited work which by name is not only recognized by the Congress as an authority, but also enjoys the force of the law to the extent it does, both as to the current edition at the time of enactment of the Federal Food, Drug, and Cosmetic Act, *supra*, as well as future supplements thereto. We find in the twelfth and latest revision thereof that the "Estrone Reference Standard" is essentially the same as that defined by the League of Nations Commission, fully substantiating the references thereto by the witnesses in this case.

Many of the highly essential provisions found in the Federal Food, Drug, and Cosmetic Act, dealing with drugs (which, within the meaning thereof in said act, include medicinal preparations), are, after all, to govern the strength, quality, and purity, as well as the labeling and branding thereof (21 U. S. C. § 351, 352, 353, 355). We cannot conceive of an individual or a corporation distributing drugs and medicinal preparations for ultimate consumption by the general public, whether they do so direct to the medical doctor, through the corner drug store, or by some other person or agency, without determining in advance—if not known at the time of the receipt thereof—the very things the importer in this case did in its laboratory with the imported product. The fact that the entry, part of the official papers in this case, is

stamped by the Food and Drug Administration, showing "No SAMPLE DESIRED" by that agency infers that before distribution of the instant merchandise to the consuming public, proper assays as to purity and potency had been or would be made.

Plaintiff attaches much importance to Dr. Wolf's testimony, *supra*, which, after defining a medicinal preparation as "a substance which is used for therapeutic purposes; in the form in which it is presented to the doctor or the patient or druggist," gives as reasons therefor that it would be necessary to have the material in proper form and dosage and that a physician's office is not equipped to apportion the right amount for each dose administered to the patient, as no physician has equipment to weigh or divide a powder into small quantities.

We cannot accept this conclusion. The fact—and we take judicial notice that it is a fact—that some doctor's offices today are not fully equipped to weigh and mix medicinals in the small quantities required of a product, such as we have in this case, cannot be accepted as sufficient reason to classify as a drug what would otherwise be a medicinal preparation. The entire treatment in plaintiff's laboratory is nothing more than a look at the imported product to ascertain its strength, quality, and purity, without changing its therapeutic value one iota, in order that it can then be used with the inert carriers or vehicles to become one of its four commercial products ultimately dispensed to the consuming public through physicians and pharmacists. Because such a simple operation is not conducted before importation, presents no reason for changing the classification adopted by the collector and substituting the one urged by plaintiff. As we said in the incorporated case, it would be a reflection upon the medical profession to announce that a preparation is only ready for medicinal use after a pharmaceutical establishment had embellished it with its own inertables, or a druggist would use it as a glossary to translate a perfectly simple medicinal preparation into a directed form.

The controlling factors, determinative of the present issue, are that the active principle of the imported estrogenic hormone undergoes no chemical change and is not compounded with other medical ingredients in its ultimate use as a remedy for the conditions described herein, and that the therapeutic properties and medicinal value of the desired estrogenic hormone remain constant from the time of importation, throughout plaintiff's procedure for proper labeling and packing, and until marketed as profitable commercial products. Accordingly, we hold the instant merchandise to be classifiable as a medicinal preparation under paragraph 5, *supra*, as amended, as assessed by the collector.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.