## McKESSON & ROBBINS *v.* UNITED STATES (No. 967).[1]

PEPPERMINT CRYSTALS, A MEDICINAL PREPARATION.

The merchandise is not a crude drug, but a manufacture from the peppermint plant and known as menthol. This menthol as imported is sometimes used without the addition of any carrying material for medicinal purposes, while its more common use is in solution or as a salve mixed with inert matter or the like. It was properly classified as a medicinal preparation and was dutiable accordingly under paragraph 65, tariff act of 1909.—Battle & Co. Chemists' Corporation *v.* United States (108 Fed., 216), Fink *v.* United States (170 U. S., 584).—United States *v.* Sheldon (2 Ct. Cust. Appls., 485; T. D. 32245) distinguished.

United States Court of Customs Appeals, February 1, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7376 (T. D. 32643).

[Affirmed.]

*Hatch & Clute* (*Walter F. Welch* of counsel) for appellants.

*William L. Wemple,* Assistant Attorney General (*Charles Duane Baker,* special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court.

The merchandise which is the subject of this appeal is menthol. It is also known as peppermint crystals and appears to be imported from Japan under that name. It is procured by distilling the peppermint plant and collecting the oil from the distillate. The oil is then chilled or frozen and the portion which crystallizes constitutes the menthol. It was assessed for duty as a medicinal preparation under

---

[1] Reported in T. D. 33167 (24 Treas. Dec., 175).

paragraph 65 of the tariff act of 1909. It is claimed by the importers to be classifiable in the alternative either at one-fourth of 1 cent per pound plus 10 per cent ad valorem under paragraph 20 as drugs advanced in value beyond the requirements for packing, or as free of duty under paragraph 559 as drugs in a crude state, or as a non-enumerated manufactured article. The chief reliance of the importer is that this menthol should be classified as a drug in a crude state, and it is said in the brief of counsel that it is the crudest form of menthol.

Paragraph 559 provides for—

Drugs, such as barks, beans, berries, balsams, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums, gum resin, herbs, leaves, lichens, mosses, nuts, nutgalls, roots, stems, spices, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and woods used expressly for dyeing or tanning; any of the foregoing which are natural and uncompounded drugs and not edible and not specially provided for in this section, and are in a crude state, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: * * *.

This article is not provided for in the free list by name. It is not found as a natural drug, but is the result of two processes, first, distillation, and, second, the cooling process by which the menthol is separated from the oil of peppermint. It is a manufacture from the peppermint plant.

Reliance is placed upon the case G. A. 6253 (T. D. 26995), affirmed in United States Circuit Court in T. D. 28576, and on the case of United States v. Sheldon (2 Ct. Cust. Appls., 485; T. D. 32245). In each of these cases it will be noticed that the article held to be a crude material was provided for eo nomine in the tariff act. In the one case camphor was provided for. In the other case gum resin. Camphor is itself a product of the camphor tree, and before any substance derived from the tree could be properly called camphor it must have been manufactured. So, in the case of gum resin, crude, "not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs," it was held in the case of United States v. Sheldon that any process by which nothing other than gum resin was produced was not a process of manufacture which took it out of this paragraph. In other words, that the mere removal of impurities did not make the substance of gum resin which was left other than gum resin.

But in the present case there is no such substance as menthol provided for in terms in the tariff act. The herb or peppermint plant might properly be called a crude drug, but this article is not such.

The case of the United States *v.* Merck et al. (66 Fed., 251), dealing with elaterium, is not controlling. The substance in that case was imported in little cakes and varied much in quality. It was not used in this form by the physician. The manufacturer extracted from the cakes their vital principle, which was known as "elaterine." It was held that the imported article was not a medicinal preparation, but an article from which a medicinal preparation could be made. It was said:

> It is a deposit from the juice or is the evaporated juice of the fruit, and from it its active principle is subsequently extracted.

So, in the case of Cowl *v.* United States (124 Fed., 475). The subject matter of the importation was a drug known as guarana. It was prepared and imported in the form of a dark brown, hard, sausage-shaped roll a foot or more in length and from 2 to 3 inches in diameter, and consisting of a paste prepared from the seeds of *Paullinia sorbilis*, the process consisting in shelling the seeds and moistening them in water, removing a papery film over the kernel, pounding them in a mortar, sufficient water being added to reduce it to a semisolid consistency, the article then being made into the form of rolls and wrapped in leaves and dried in the sun or by the fire. The testimony was that it was sold to manufacturers and wholesale dealers, but not to retail druggists, as it was never used as a medicine in the condition in which it was imported, but before being used was prepared as a powder, elixir, or extract, crushed leaves and other impurities having been removed in the process of preparation.

These cases are clearly distinguishable from the present. For, as we shall see in the present case, the article as imported is in fact used for medicinal purposes, without any chemical or other change in the product itself. It is said in the brief of counsel that this article is not used as imported. It is not generally used by itself in the form as imported, but that it is used without purification as an ingredient with carriers or in solution appears, as we think, by the overwhelming weight of the testimony and by the testimony of the importers' witnesses.

Mr. Gane, who was a witness produced on behalf of the protestants, was asked:

> Is menthol for use medicinally always incorporated with other ingredients before it is used by the patient?—A. Yes; in its crude form I don't think it is ever used directly; it has to be compounded with some other preparation before it is fit for use by the patient.
>
> By General Appraiser McCLELLAND. Well, is its condition changed when it is compounded other than being mixed with other ingredients?
>
> A. Oh, no; simply brought into solution or mixed up in powdered form.
>
> Q. It is used in its present form in combination with other articles?—A. Yes; for medicinal purposes.

Further on this witness testified:

Q. It comes here in bulk?—A. Yes, sir.

Q. And what manipulation is it subjected to in your hands, as druggists, when you receive it?—A. Well, sometimes we purify this preparation before we use it for medicinal purposes, according to what we want to use it for.

Q. Refine it?—A. Yes, sir.

Q. And you use it without refining it frequently, do you?—A. Yes, sir.

Q. And it goes into the market in the form in which it appears in this bottle?—A. Yes, sir.

Q. And do you know for what particular use it may be applied, or is applied, in the form that it appears in that bottle?—A. In the form it appears in that bottle I don't think it is applied for any particular use. To my knowledge, it is not applied in that form at all.

Q. Does it go into the hands of the retail druggists in that form?—A. Yes, sir. * * *

Q. And they subsequently, I suppose, mix it in solutions or with other substances?—A. Yes, sir.

Further on this witness testified:

General Appraiser McClelland. Is this article ever used by itself as imported?

A. Not in its crude form. It is always compounded.

Q. To fit it for use all that is necessary is to compound it in its present condition with certain other ingredients?—A. Yes, sir.

There is some testimony in the record that this substance as imported is used in small bottles or vials as a smelling salt for its medicinal properties to alleviate headaches. It is also made up in the form of cones or pencils and applied to the parts afflicted. When made in this form there is added to it a substance to give it a consistency which enables it to hold its shape and containing no additional medication.

The witness Richard H. Baxter, produced by the importers, testified:

Q. What is the menthol inhaler you make?—A. The menthol inhaler is practically menthol with the additional combination necessary to compound it in that form.

Q. What is the necessary combination in that form?—A. Partly talc. * * *

Q. And the medicinal properties of the tube is menthol crystals?—A. It is.

There is some claim that this substance is used for flavoring purposes. But it is apparent that this is a very infrequent use of the article.

The importers produced as a witness Joseph Matthias, who was asked:

Q. Do you ever sell this article to the ultimate consumer?—A. Yes, sir.

By General Appraiser McClelland. What class of trade does that consist of?

A. Druggists, pharmaceutical trade, and manufacturing confectioners.

Q. Do you sell menthol in any other form than Exhibit 1?—A. No, sir.

By Mr. Welch. Do you know what the confectioners use t for?

A. Yes.

Q. For what purpose do they use it?—A. As a medicament in cough drops, mentholated cough drops.

It appeared therefore that this article is used as a medicine and has no other practical use of any consequence.

Does the fact that in its customary use it is to be put in form for such use by the use of a carrier or that it is to be dissolved, so long as it requires no chemical change and no compounding with other medical ingredients to make it useful as a medicine, result in taking it out of the category of medicinal preparations? We think not.

This question was considered in the case of Battle & Co. Chemists' Corporation *v.* United States (108 Fed., 216). The subject there under consideration was chloral hydrate, and the language of that case peculiarly fits this case. I quote:

> The evidence also satisfactorily shows that chloral hydrate, although generically speaking, a "chemical compound" of hydrogen, oxygen, and chlorine, is distinctively known in the trade and commerce as a "medicinal preparation"; and although it is imported and sold to druggists and pharmacists in crystalline form, it is in that form a preparation for use medicinally, requiring no further chemical reactions for that purpose. It is true it is not commonly administered to the patient in its crystalline form, but is dissolved in water or sirup. This, however, is not for the purpose of chemically changing its substance or quality in any manner, but for the purpose only of providing a vehicle to convey it to the stomach. I do not think the evidence, taken as a whole, establishes the proposition of fact contended for by plaintiff that a "medical preparation," as used either in commerce or by the medical profession, is merely and only such a preparation of drugs and chemicals as is fitted and ready by itself for the use of the patient. If such were the case, as one of the witnesses properly remarks, the term would be limited in its application practically to patent medicines. The term, in my opinion, as shown by all the evidence in the case, rather means any preparation used for remedial purposes for the ailments of the human and animal body. But, even if the limited meaning contended for by plaintiff be given to it, I do not believe the use of water merely as a solvent to act as a vehicle for introducing the drug into the stomach is such a further preparation of the drug as changes it from one not prepared for the patient to one so prepared. It is the same thing either way—a preparation used by druggists and physicians for remedial purposes—and falls clearly within the term as employed by the acts of 1890 and 1897, a "medicinal preparation."

See also Fink *v.* United States (170 U. S., 584). In that case it was held that muriate of cocaine was properly dutiable as a medicinal preparation. It is said in the brief of counsel for appellant that this case is not authority, for the reason that it was certified by the Circuit Court of Appeals with a statement of facts, and that embodied in the facts was a statement that—

> The commercial meaning of the term "medicinal preparation" is the same as its ordinary meaning, namely, a substance used solely in medicine and prepared for the use of the apothecary or physician to be administered as a remedy in disease. Muriate of cocaine is dispensed in the form in which it is imported, or more often reduced therefrom to a powder by means of a mortar and pestle, or diluted in water or admixed with inert or neutral matter.

This, it is true, occurs in the statement of the case as certified by the Circuit Court of Appeals, but at least it contains a holding by that court that the ordinary meaning of "medicinal preparation" is a substance used solely in medicine as it is used by the apothecary or physician to be administered as a remedy in disease, and the manner

of dispensing the drug in question there corresponds with that in the present case. There is no want of testimony in this record that this menthol as imported is sometimes used without the addition of even carrying material for medicinal purposes. Its more ordinary use, however, is in solution or as a salve mixed with inert matter or as a pencil in which talc is used to maintain the form of the pencil, so that the cases are not dissimilar.

Another significant fact should be stated, which is that for a period of 12 years at least this importation has been classified as a medicinal preparation.

The board was not in error in so classifying it, and the decision is *affirmed*.