(C. D. 803)

SYNTHETIC PATENTS CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 10, 1943)

*Eugene R. Pickrell* and *Eugene A. Chase* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks, Joseph B. Brady,* and *Frank X. O'Donnell, Jr.,* special attorneys), for the defendant.

COLE, Judge: Medicinal preparations, classifiable at 25 per centum ad valorem under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), and drugs—those in a crude state entitled to free entry under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669) and those advanced in value or condition dutiable at 10 per centum ad valorem under paragraph 34 of the said tariff act (19 U. S. C. 1940 ed. § 1001, par. 34)—are not as easily distinguishable as many surmise, and when presented under the guise of a legal controversy, as in this case, the court, like other laymen, concedes the difficulty in untangling the confusion caused by testimony of a highly technical character. Definitions of technical words are supplied in footnotes. (Funk and Wagnalls New Standard Dictionary.)

The very definite difference in treatment accorded the respective products in the tariff act indicates an understanding by Congress that a real distinction between them existed and was intended to be respected. In other words, Congress is presumed to have had good and sufficient factual basis for setting up such separate provisions and to possess in its records and files, making up the much sought for Congressional intent, convincing and sound reason therefor in order that the administration thereof can be effective and complete.

It becomes increasingly difficult to give proper expression to such Congressional intent in the light of the similarity found between the statutory definition of the term "drug," and the judicial interpretation of the provision for "medicinal preparations." In paragraphs 34 and 1669, *supra*, the word "drug" is defined for tariff purposes as "those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes." The statutory provision for "medicinal preparations" has been held (*United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, T. D. 41706) to be limited to articles whose chief use is for medicinal purposes. The similarity between the two tariff provisions was succinctly expressed in *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038, wherein the appellate court said: "Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal."

The foregoing introduction serves to emphasize the fine distinction which must be drawn in deciding the issue presented herein, dealing with merchandise that possesses therapeutic qualities and is used for medicinal purposes. The nature and the use of the article under consideration are common to the characteristics which would render it classifiable, under the cited authorities, either as a drug or a medicinal

preparation. Either of said provisions standing alone would apply for classification of the merchandise thereunder. The situation is not unlike that discussed in *Fink* v. *United States*, 170 U. S. 584, wherein the Supreme Court, speaking through Mr. Chief Justice White, said:

> There can be no doubt that the article in question from some points of consideration might be classified under either of the paragraphs of the statute referred to in the certificate. Thus, within the purview of paragraph 74, it is obviously a medicinal preparation, in the preparation of which alcohol is used. It is also equally clear that it is likewise, chemically speaking, a salt, and hence within the reach of paragraph 76. It would then follow that if either of the paragraphs stood alone in the statute, disembarrassed of the provisions found in the other, the preparation might properly come under the head of either. Being reached, then, in some of its aspects by some of the provisions found in both paragraphs, the question is, which, if either of the two, is so dominant in its control of the article in question as to exclude the operation thereon of the other? The rule is that this, if possible, is to be determined by ascertaining whether one of the two paragraphs is more definite in its application to the article in question than is the other.

The language employed there may be applied here, for the issue, as stated, presents a conflict between two kindred provisions of the tariff act, and in the absence of either, the remaining provision might very easily be invoked for classification purposes.

The commodity in question is a pancreatic [1] hormone imported in an aqueous solution. It is used to correct circulatory disorders in humans. The collector of customs at the port of New York, where it was entered, classified it as a medicinal preparation, applying the rate therefor as set forth in paragraph 5, *supra*. Plaintiff claims it is properly classifiable as a drug, invoking the paragraph providing for crude drugs, paragraph 1669, *supra*, as well as the one contemplating those advanced in value or condition, paragraph 34, *supra*. Alternative claims are made under paragraph 1558 (19 U. S. C. 1940 ed. § 1001, par. 1558), alleging classification either at 10 per centum ad valorem as a nonenumerated unmanufactured article, or at 20 per centum ad valorem as a nonenumerated manufactured article, but they were not stressed either at the trial or in the briefs.

Plaintiff introduced the testimony of two qualified witnesses, who explained the procedure followed in acquiring the imported product, and its subsequent treatment, making it available for commercial usage under the label "Padutin," marketed by Winthrop Chemical Co., the ultimate consignee, with whom both witnesses are connected. One, Dr. Bruno Peutzer, is a pharmaceutical chemist with several years' research experience in Germany, the country of exportation of the present merchandise. The other, Dr. O. W. Barlow, is a biochemist and pharmacist, who supervised assaying the imported commodity for its ultimate use by his company.

---

[1] "pancreatic," *a.* Of, pertaining to, or produced by the pancreas.

Dr. Barlow described a hormone as "a substance that is excreted by one of the several glands of internal secretion, this hormone in turn is excreted directly into the blood stream for its physiological effect on one or more of the distant systems of the body."

Dr. Peutzer observed, in the exporting country, the method pursued in acquiring the imported commodity. His description thereof supports this factual finding: The particular hormone under consideration is obtained from male urine, having been carried as an excretion from the pancreas.[2] An alcoholic solution containing benzoic acid is added to the urine thus precipitating[3] the hormone with impurities. The benzoic acid is dissolved by the addition of alcohol, and then the solution is washed with water to free it from alcohol. To precipitate the impurities, the hormone is dissolved in a very dilute caustic solution, which is neutralized[4] with hydrochloric acid. The solution is dialyzed[5] against pure distilled water, using a semipermeable[6] membrane,[7] to remove inorganic salts, bringing the active hormone in an aqueous solution that is concentrated[8] in a vacuum under very low temperature, the hormone remaining in the bag. Before shipment, the product is assayed to determine the number of biological units per cubic centimeter in the hormone solution, one biological unit being the quantity of the solution which will neutralize the effect of 1 one-thousandth of one milligram of epinephrin. The assaying process does not affect the potency of the active principle (the hormone) but merely determines the strength of the solution, which in this case, as indicated on the consular invoice, was "1 cc. equals 9.03 units." Epinephrin is used in this determination because of its faculty to constrict or contract the arteries with the resultant increase in blood pressure. As a preservative during the period of shipment, approximately 2 per centum meta cresol is added.

It is the contention of plaintiff that the merchandise in its condition as imported, which controls its tariff classification (*Worthington* v. *Robbins*, 139 U. S. 337), is not ready to be administered, and therefore has not reached the tariff status of a medicinal preparation.

Before Winthrop Chemical Co. dispenses the commercial product using the imported hormone, the latter is subjected to an assaying

[2] "pancreas," *n.* A gland connecting with the alimentary canal; in man, a large racemose gland behind the peritoneum, between the lower part of the stomach and the vertebrae of the loins, and emptying into the duodenum by one or more small ducts; * * *.

[3] "precipitating" (precipitation, *n.*) 5. *Chem.* The process of rendering insoluble and so separating any of the constitutents of a solution, as by reagents; * * *.

[4] "neutralize," *vt.* 2. *Chem.* To make neutral or inert, as by the addition of an alkali to an acid solution * * *.

[5] "dialyzed" (dialysis *n.*) 2, *Chem.* The act or process of separating solutions of mixed substances of unequal diffusibility (as crystalloids and colloids) by taking advantage of their different capacities for passing through moist membranes or septa (the crystalloids passing through freely and the colloids slowly or not at all).

[6] "semipermeable," *a.* Traversable by certain molecules while resisting the passage of others, as in the case of osmotic membranes that separate a solvent from the dissolved substance.

[7] "membrane," *n.* 3. A piece of parchment or vellum.

[8] "concentrate," *a.* Concentrated; especially, chemically purified, or intensified by reduction.

process by that firm. Dr. Barlow, director of the biological research laboratory of the said company, stated that the purpose of this assay is to fix the potency of the imported merchandise, "to determine the relative vasodilating [9] properties." This is accomplished, as testified to by the witness, by measuring the antagonizing effects of the hormone against a standard vasoconstricting [10] agent, epinephrin. A minimum of three dogs is used in the experiment, and from five to ten assays are made of each. After the dog is anesthetized with ether and placed on an animal board, a fixed hypnotic is administered intravenously to obtain continuous sleep without the use of ether. The animal is standardized on the basis of its responsiveness to epinephrin. Having determined the minimum dosage to get the desired effect from the vasoconstricting agent, simultaneous injections of epinephrin and the imported product are administered for the purpose of obtaining the exact ratio, so neither will cause a rise or fall in blood pressure. The result forms the basis for calculating the potency of the product in biological units. Based on this finding, the imported merchandise is diluted with sterile water to the strength of four biological units of active hormone per centimeter at which it is dispensed. To make the solution isotonic, i. e., giving it osmotic pressure equal to that of blood plasma, sufficient sodium chloride is added so the quantity thereof will be about nine-tenths of 1 per centum of the solution. The meta cresol content is adjusted to one-tenth of 1 per centum for preservative purposes, the solution is rechecked for activity and sterility, and the final preparation placed in 1 cc. ampoules and marketed under the trade name "Padutin" (plaintiff's exhibit 2).

Defendant introduced the testimony of three chemists, all connected with reputable pharmaceutical houses in this country. Although each admitted having had little or no practical experience with pancreatic hormones, all were permitted to answer a hypothetical question, framed in language taken from that used by plaintiff in describing the procedure followed prior to offering the instant merchandise for sale, as to whether or not the product is a medicinal preparation. Their conclusions, however, have little if any probative value, not merely because of their lack of experience but largely because of the legal construction placed on the statutory terms in issue.

In a line of decisions (*Battle & Co. Chemists' Corp.* v. *United States,* 108 Fed. 216; *McKesson & Robbins* v. *United States,* 3 Ct. Cust. Appls. 515, T. D. 33167; and *William Cooper & Nephews, Inc.* v. *United States,* 10 Cust. Ct. 247, C. D. 763) the courts have held imported merchandise properly classifiable as medicinal preparations where it was shown that the product in question required no chemical change

[9] "vasodilating" (vasodilatation *n. Pathol.*) The widening of the caliber of the blood-vessels as by a drug.
[10] "vasoconstricting" (vasoconstriction *n.*) The narrowing of the caliber of the blood-vessels, as by the action of a drug.

or compounding with other medical ingredients, from its imported condition, for its medicinal use. That the merchandise was diluted or mixed with some inert carrier when administered, did not affect its tariff classification as a medicinal preparation. The chloral hydrate, subject of the litigation in the *Battle & Co. Chemists' Corp.* case, *supra*, was dissolved in water or sirup when administered to patients solely to provide a vehicle to convey it to the stomach. The menthol involved in the *McKesson & Robbins* case, *supra*, was obtained from processed oil, derived from the distillates of the peppermint plant. It was not generally used by itself but combined with some inert carrier, either in solution or as a salve. In our recent decision in the *William Cooper & Nephews, Inc.*, case, *supra*, derris resin compound, consisting of 12 per centum derris resin and 88 per centum an inert substance (clay), was reduced in strength after importation to make it commercially safe as the only active ingredient in animal insecticides. In all three cases, however, the therapeutic qualities of the product remained unchanged.

What was true of the different products before the court in the cited cases can be said also of the hormone in question. No chemical change occurs from its condition as imported and its appearance in the commercial product. In fact, its therapeutic value remains constant from the time it is acquired in the raw state until it is offered and sold to the trade under the label of "Padutin." Plaintiff admits that it has no deleterious effect when administered in its imported condition, but it "causes a severe degree of pain in the patient," and "tends to cause a necrotic[11] change in the muscles, and the swelling persists from 3 to 7 days."

It is to alleviate this discomfort and give the product greater tolerance that Winthrop Chemical Co. adjusts the strength and consistency of the imported commodity, through the processes hereinabove outlined, and then offers it under its trade name of "Padutin," carrying a label with statements that agree with the determinations found in their assay, as testified to herein. The witness, Barlow, admitted that "The purpose of changing the solution is to make the material received conform to standards set up for this product" by his firm, and further stated, "The purpose of the experimentation is actually to prove that the product that we will market is biologically potent, and exactly corresponds to our labels." The important factor, if not the determining one, is that the therapeutic value of the hormone, the only active ingredient in the solution when imported and when offered as "Padutin," never changes.

The merchandise in question is not a drug because it has been processed, at the time of importation, to a condition, making it

---

[11] "necrotic" (necrosis, *n.*)  **1.** *Pathol.*  The death of part of the body; mortification; gangrene; as, *necrosis* of a bone.

readily available for medicinal purposes. In its treatment prior to the importation, all impurities harmful to the human body as well as undesirable inorganic salts are removed, and it is ready to be dispensed as a corrective for circulatory disorders. In the case of *United States* v. *Merck et al.*, 66 Fed. 251, which plaintiff stresses to support its contention that the instant merchandise is a drug, the imported product consisted of a dried sediment obtained from fruit juice. After importation, the active ingredient was removed and used as an element in a medicinal preparation. In our recent decision in *Geo. S. Bush & Co., Inc.* v. *United States*, 10 Cust. Ct. 313, C. D. 773, holding merchandise to be an advanced drug, the dogfish-liver oil there involved was found to be used, for its vitamin content, as an ingredient in preparations having pharmaceutical and veterinary purposes.

We find authority in all of the cited cases for the distinction, for tariff purposes, between the term "drug," connoting a substance or material useful for medicinal purposes, and a "medicinal preparation," being a product, with therapeutic qualities, ready for medicinal use.

For reasons hereinbefore set forth, the instant merchandise is a medicinal preparation, and the court so holds. The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.