ROCHE–ORGANON, INC. *v.* UNITED STATES (No. 4578) [1]

United States Court of Customs and Patent Appeals, January 6, 1948

*Eugene R. Pickrell* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument November 21, 1947, by Mr. Pickrell and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, rendered in conformity with its decision, C. D. 1048, overruling the protest of the importer and sustaining the collector's classification of a substance invoiced as "Urine Concentrate in form of R III-crystals," entered at the port of New York. The sub-

stance is said, in the brief for the Government, to be known to the medical profession as "the estrogenic hormone."

The collector classified the merchandise as a medicinal preparation, not specially provided for, under paragraph 5 of the Tariff Act of 1930, duty being assessed at 12½ per centum ad valorem in conformity with the reduced rate provided in the trade agreement with Argentina, T. D. 50504, 77 Treas. Dec. 138, 149.

In its protest appellant made alternative claims, viz: (1) For classification under paragraph 1669 of the 1930 act (with consequent free entry) as a crude drug of animal origin; or (2) for classification under paragraph 34 (with duty assessment at 10 per centum ad valorem) as a drug of animal origin advanced in value or condition; or (3) for classification under paragraph 1558 (with duty assessment at 10 per centum ad valorem) as a nonenumerated unmanufactured article.

The merchandise was manufactured in Holland but imported into the United States from Curacao in the West Indies. It is agreed that it is the same in all respects as that which was involved in the case of *Roche-Organon, Inc.* v. *United States*, 12 Cust. Ct. 164, C. D. 848. Protest 95742–K, decided by the Customs Court April 29, 1944, and not appealed. We hereinafter refer to that case as the first case. The instant case is in effect a retrial of the issues there involved and, upon motions of counsel for the respective parties, the record of that case was incorporated in and made a part of the record in the instant case. It, in fact, constitutes the major part of the record so far as the evidence is concerned.

At the trial of the first case appellant introduced the testimony of two witnesses—Bernard Joseph Brent, Ph. D. (not an M. D.) and Doctor of Chemical Engineering, who was the scientific director of appellant's business which is that of preparing hormones for commercial distribution, and Ralph D. Shaner, M. D., who was employed by appellant as its medical director and who was also engaged in the private practice of his profession. Appellant also introduced in evidence a number of documentary and physical exhibits all the originals of which were destroyed by fire in the sample room of the United States Customs Court after the case had been argued before it and before its decision had been rendered. Some of the documentary exhibits could not be replaced. Such of them as could be were replaced by stipulation of counsel together with the physical exhibits. Of those which are missing the Customs Court said "their presence is not regarded as essential for a proper determination of the issue," and this view obviously was acquiesced in by counsel for the respective parties.

The physical exhibits introduced by appellant are five in number, Exhibit 1 being a sample of the merchandise in its condition as imported, and exhibits 2, 3, 4, and 5 being samples of the commercial

product prepared by appellant with the use of the imported product after its importation.

At the trial of the second (the instant) case appellant supplemented the testimony of Messrs. Brent and Shaner with that of William Wolf, M. D., apparently an active member of his profession who specializes in endocrinology—the "study of the function and action of the ductless glands"—who has written extensively upon that subject.

The only witness called on behalf of the Government was Ephraim Shorr, M. D., whose professional activity and experience seem to have been quite extensive. He appears to have specialized for many years past in the field of ductless glands "related to the female sex hormones," and has written much upon the subject.

We have deemed it unnecessary to recite the training and work of the several witnesses in great detail. They seem to have been well qualified to give testimony concerning the matters about which they were questioned.

In reality they do not differ in any essential degree as to the nature of the imported substance, Exhibit 1, nor as to the nature of the preparations illustrated by exhibits 2, 3, and 5 made from that exhibit. Their views with respect to Exhibit 4 are hereinafter set forth in detail.

Prior to testifying, Doctor Shorr, with the consent of counsel, was furnished some of the imported substance which he caused to be used in the preparation of tablets which, as we understand it, corresponded to appellant's Exhibit 5—Menformon Tablets—and these were introduced in evidence as Illustrative Exhibit A. He described in detail the process by which he directed the tablets to be made. The tablets so made were used by Doctor Shorr in the treatment of patients having deficiencies in the estrogenic hormone, along with tablets represented by Exhibit 5.

Brent was the only witness who testified respecting the production of the imported substance. After attending and receiving degrees from different institutions in Germany, the last one in 1929, he was employed for about 3 years as scientific director of a company in Hamburg, Germany, engaged in the manufacture of pharmaceutical products, some of them hormones. Thereafter he taught and conducted research work until some time in 1933 when he was employed as director of certain departments in the plant of Organon, N. V., located at Oss, Holland (the relation between the Holland concern and appellant, if any, is not shown). His work included research on estrone and the production of hormones. He remained with the Holland company for about 4 years—that is until in 1937 when he came to the United States and became the scientific director of appellant.

Brent's testimony respecting the operations by which the imported

substance was produced in Holland is meager. It is well summarized in the decision of the Customs Court as follows:

\* \* \* The imported commodity consists of equilin, equilenin, hippulin, possibly some estradiol, coloring matter, and "about 90 per cent oestrone," all of such substances being hormones found naturally in the urine of pregnant mares. The desired product is the estrogenic hormone for its therapeutic properties capable of correcting conditions peculiar to females. It is obtained from urine collected between the sixth and ninth month of pregnancy that extends over 11 months. The selected period is the time when the hormone excretion is at its highest. Although the witness was thoroughly familiar with the procedure followed to acquire the imported merchandise, having observed it during his 4 years' experience with the foreign producer in Oss, Holland, and being in possession of "the procedure of manufacture," he refused to describe what he admitted to be a highly involved and complicated process, stating, "I do not know whether I am at liberty to do so, because the company has a procedure of its own which has not been described in the literature yet, and I don't think I am at liberty to divulge the process" (referring obviously to what transpires before importation). Only a sketchy outline was given, consisting merely of a statement that the urine is acidified by adding a mineral acid and ultimately concentrated to form "a tarry, brown foul-smelling mass which is further repurified by the use of organic solvents, and at a certain point this purification is stopped." Controlling purification of the urine is for the specific purpose of avoiding conflict with a product in this country that is protected by the Allen and Doisy patent, covering one hundred per centum pure oestrone.

The foregoing applies solely to the processing which took place at the manufacturing plant in Holland, and in this connection it is interesting to note that the witness testified, in substance, that about 25,000 gallons of urine would be required to obtain one kilogram (2.2 pounds) of Exhibit 1.

Concerning the treatment and processing expended upon the product after importation the witness testified in greater detail. It was assayed biologically in order to determine the number of international units contained in the importation, the international unit being a standard measure of precisely known potency, defined in the United States Pharmacopoeia. In the case of assaying the substance illustrated by the particular exhibit (subsequently destroyed by fire) which was before the Customs Court, the witness stated that a sample "was injected at different doses to spayed mice," some fifty such mice being used, and vaginal smears were made which were compared with the standard measure. In the words of the Customs Court, "The instant merchandise was found to contain '8.8 million international units to the gram,' or approximately 10 per centum less potent [potency] than the recognized standard \* \* \*."

To state the matter in different phraseology, as it is stated in substance in the brief for appellant, 90 per centum of Exhibit 1 is estrone and the remaining 10 per centum consists of equilin, equilenin, hippulin and perhaps some estradiol (all the ingredients so named being

female hormones natural to the urine of pregnant mares) plus some coloring matter.

The merchandise was also chemically tested after importation to ascertain the melting point and optical rotation.

The purpose of assaying and testing the substance appears to have been twofold; first, to make certain that the purification process carried out before importation had been discontinued in time to prevent the production of an estrone so pure that it would infringe the patent referred to, and, second, in order to know how much to increase the gram weight of the active hormone in preparing the substance for distribution in the forms represented by exhibits 2, 3, 4, and 5.

It is noted that appellee's witness, Shorr, testified that the operation in appellant's laboratory was "the usual assay which is required by the Food and Drug Administration and the Council of Pharmacy of the A. M. A. [American Medical Association]."

We again draw upon the decision of the Customs Court and quote its summarization of the testimony of the witness Brent relative to exhibits 2, 3, 4, and 5.

The imported estrogenic hormone is used in the manufacture of four products, commercially marketed by plaintiff under the following labels: "Menformon Injections," collective exhibit 2; "Menformon Dosules," collective exhibit 3; "Kolpon Inserts," collective exhibit 4; and "Menformon Tablets," collective exhibit 5. In the preparation of these products the imported merchandise is dissolved in an organic solvent, either acetone or ether, that is removed before the active hormone is mixed with an inert carrier in definite proportions convenient for commercial distribution. The particular vehicle, used as a carrier with the estrogenic hormone, is dependent upon the form in which the hormone is to be commercially offered. For the injections, peanut oil is employed to dilute the solution to the desired concentration, from 1,000 to 10,000 international units per injection. When dispensed as "Menformon Dosules," the active principle is combined with animal fat and the mixture emulsified with "cholesterol, lanum, and petrolatum and water, and antiseptics and some perfume is being added." The dosules are offered in two strengths, i. e., 2,000 international units per dosule and 5,000 international units per dosule. In tablet form, the estrogenic hormone has a milk-sugar base with the addition of "different starches and water" as auxiliaries for its application. The tablets come in two degrees of strength, "1,000 and 10,000 International Units per tablet." The inserts consist of the active hormone with sodium phosphate and glucose, the combination having been vacuum dried and the resulting flakes broken into fine powder that is pressed to form the finished product. Sodium phosphate is used as a buffer salt "to assist the estrogenic hormone in its activity," and tends to give the affected area a healthy condition more quickly for the active properties of the hormone. The inserts are produced in two sizes; those for children containing 500 international units each and the ones for adults having 1,000 international units. The chemical formula of the imported oestrone is in no way changed after it has been processed by the importing corporation to any of its commercial products.

It appears from the testimony of the witness Shaner that all of the products, exhibits 2, 3, 4, and 5, are principally intended for the

relief of certain ailments peculiar to females, menopause disorders being the principal group of such ailments. The Menformon Injections (Exhibit 2) are administered intramuscularly by the use of a hypodermic needle; the Menoformon Dosules (Exhibit 3) are applied as an ointment being rubbed on the skin of the affected area; the Kolpon Inserts (Exhibit 4) are used as vaginal suppositories; and the Menformon Tablets (Exhibit 5) are taken orally.

. The witness also identified certain pamphlets, which were filed as exhibits, that were sent to physicians for their information in administering the product.

· Asked how he would define "a medicinal preparation," the witness said:

I would define medicinal preparations as a substance with a pharmacodynamic action of such a degree that doses can be obtained with devices at the disposal of the physician or the allied healing arts, nursing, or the pharmacist, that will do no harm.

·· Asked for his opinion respecting Exhibit 1, he stated that he would not consider it to be a medicinal preparation, giving as his reason:

· Because it is a substance that were you to put it in the office of the average practitioner, he would not dare apply it because he has no means of obtaining a dose which would not be harmful.

The witness then testified as to the danger inherent in administering an over-dosage.

Under cross-examination the witness testified to the effect that it was his "personal belief that no substance that is imported qualifies as a medicinal" unless it is put up in such "packaging" that the individual physician can use it immediately.

He conceded in his cross-examination that the vehicles and carriers added to the active ingredients of exhibits 2, 3, and 5 are inert, but asserted that the glucose and sodium phosphate used with the Kolpon Inserts (Exhibit 4) "are both believed to have an active role," because their use "concerns itself with the maintenance of vaginal acidity."

We quote the following from his cross-examination:

X Q. In other words, it concerns itself with the local effect, rather than the therapeutic effect?—A. The local effect is the therapeutic effect here, in the case of this preparation.

X Q. Well, it is not the acidity you are trying to maintain, is it?—A. That is one of the effects we are striving to obtain, yes.

· X Q. By the insertion of the active ingredient you are trying to maintain the acidity?—A. Yes.

· X Q. Well, now, you do treat diseases which you might treat by the insert—you treat such diseases also by means of the oral tablet and the injection method?—A. Yes.

At another point the witness testified:

When you give the estrogen you attempt to bring about a state of growth and increased resistance in the vaginal lining. Now, the cells of the vaginal epi-

thelium excrete glycogen glucose which, in the vagina, is converted into lactic acid, which in turn gives rise to an acid condition with an acidity between 4.5 to 5.0. Now, when you give Kolpon Inserts, your estrogen is believed to be absorbed through the vaginal epithelium and you have your estrogenic effect locally. At the same time you provide glucose in advance of the formation of glycogen glucose by the cells, which is broken down in the vagina to give you lactic acid, hence increased acidity. Then your buffer salt, sodium phosphate, once the acidity is there, helps to maintain it.

He conceded that the same disease for which Exhibit 4 is used could be treated and the same result obtained, though possibly not quite so quickly, by the "Menformon Injections" (Exhibit 2) and by the use of "Menformon Tablets" (Exhibit 5), taken orally, and that the two latter have no glucose or sodium phosphate or any substitutes therefor.

The witness Wolf has actively practiced his profession; has been advisor to manufacturers of hormone preparations; and has been consulted by the Food and Drug Administration on the use of estrogen as ointments. So far as disclosed by the record, he has had no connection with appellant. He used the products made after importation in varied doses, but as said by the Customs Court, "Whether he prepared a dosage or accepted someone else's label, is not disclosed by the record."

In the course of his examination the following appears:

Q. Doctor, how would you define medicinal preparation?—A. A medicinal preparation is a substance which is used for therapeutic purposes; in the form in which it is presented to the doctor or the patient or druggist.

Q. It is then your opinion that it is a substance containing a therapeutic substance ready for administration?—A. Yes.

He was asked a hypothetical question inquiring whether in his opinion the substance as imported "is a medicinal preparation" to which he replied, "No, it is not," and stated his reason for the opinion:

Because it would be necessary to have the material in proper form and dosage. Since a physician's office is not equipped to apportion the right amount for each dose administered to the patient—no physician has equipment to weigh or divide a powder into small quantities. Since the doses are so very small, one of the larger doses is no more than a milligram, which is a thousandth of a gram, and a gram is one-twenty-fifth of an ounce, and if one were to dose haphazardly, considerable damage might be produced and neither the patient nor the physician would be fairly handled.

A further hypothetical question inquired, in effect, whether, in his opinion, the sodium phosphate used in the Kolpon Inserts (Exhibit 4) would have any therapeutic effect. To this he replied "Yes," and stated as the reason for his opinion: .

Sodium phosphate would make the vaginal environment sufficiently acid to for it to normalize the epithelium, the vaginal epithelium and at the same time, suppress undesired bacteria flora.

There was no cross-examination of this witness.

We think it proper to state at this point before discussing the testimony of appellee's witness Shorr that, in our opinion, it is clear from the testimony of appellant's witnesses alone that the imported substance was one having only therapeutic value; that the fact that it was only 90 per centum pure estrone did not affect its therapeutic quality, although it required slightly more of it to constitute the proper dosage than would have been required of pure estrone; and that the treatment which it received in the laboratory before being used in making the different types of commercial products had no chemical effect upon it and wrought no change in its nature, chemical or otherwise.

In other words, the imported substance without any change from its condition as imported entered into and constituted the active ingredient of the products illustrated by exhibits 2, 3, 4, and 5.

Furthermore, we think it is equally clear from the testimony of appellant's witnesses alone relative to exhibit 2, 3, and 5 that the substances used with the imported substance were inert and without any therapeutic qualities or values. They were merely vehicles, or carriers, for the active ingredients and added nothing to the remedial or curative character of the products. The quantity of the active ingredient in a dose of the commercial products of lowest strength was infinitesimal and even in those of highest strength was very, very small. This obviously is one reason, probably the principal reason, why fillers or carriers were used. They were not added for therapeutic reasons.

It might be added that the testimony of appellee's witness Shorr, who was examined and cross-examined at considerable length upon various of the questions involved in the case, fully supports the finding of facts so far made upon the basis of the testimony of appellee's witnesses, and we deem it unnecessary to set forth his testimony upon those points in detail.

With respect to the proper definition of medicinal preparations (which is hereinafter discussed) and the therapeutical status of the glucose and sodium phosphate used in the preparation of the Kolpon Inserts (Exhibit 4) there appears to be a difference of opinion between Doctors Shaner and Wolf on the one hand and Doctor Shorr on the other. The pertinent testimony of Doctors Shaner and Wolf has been quoted or paraphrased, *supra*. A careful study of it leads us to the conclusion that they really went no further than to indicate a belief that sodium phosphate might possess some therapeutic value.

Doctor Shorr during his cross-examination testified first broadly to the effect that none of the materials combined with exhibits 2, 3, 4, and 5 have any therapeutic effect related to the estrogenic activity. We do not find where either Doctor Shaner, who testified before Doctor Shorr, or Doctor Wolf, who testified after him, expressed the

view that the sodium phosphate did have any therapeutic effect "related to the estrogenic activity." Doctor Shaner, as quoted *supra*, expressly said "The local effect is the therapeutic effect here, in the case of this preparation [Exhibit 5]."

We quote the following more specific testimony from Doctor Shorr's cross-examination:

X Q. Does that sodium acid phosphate have any therapeutic value, in your opinion?—A. I am uncertain. What I do know is that it has no effect on the specific activity of the hormone in it. In other words, you can use a vinegar douche if you wish, but that is adding something, that is not related to the effect of the hormone in that. The hormone influence is apart from that vaginal epithelium in a certain characteristic way. And whether you have that in there or you do not have it in there, or you add another acid, or you have a vinegar douche does not make any difference, you are not affecting that hormone at all, nor is—you are not making the action of that hormone any greater. The action of that hormone is, by virtue of its estrogenic property not by virtue of any of these other changes.

X Q. Does it not cause the hormone to act more quickly?—A. There is no evidence that I know of that indicates that it enhances the activity, the specific activity of that hormone to do its specific job in increasing the size of the growth of the vaginal epithelium producing a cornified resistant mucosa which inhibits infection. All these things are auxiliary and are capable of infinite variation.

He was asked if the presence of sodium acid phosphate and the glucose does not change the pH immediately, and after responding that he could not answer from his own experience but "that it might * * * it very well may," he was further asked, in effect, whether if it does change the pH it has an added therapeutic value. To this he responded:

I have no reason to feel that it does. In other words, for you, or anyone, to say that the temporary acidity while the hormone is getting ready to do the real job of building up this epithelium is better than using the hormone alone, which most of us have done in this case—you would have to have a longer series of control cases in which you would say that this short period in between the effect of the hormone and building up of this mucosa, this short and brief and not sustained period of acidity is due to this extraneous material added to your ampul, has improved the speed of recovery by a day or by two hours; no such series exists. All of the effects that have been produced fundamentally have been aimed to make a more, a thicker cornified vaginal epithelium. You can do it by mouth, you can do it by injection, you can do it intravaginally. That is the essence of it. Now, if you wish to distinguish your product, let us say, by some nicety that is—well, I do not think it is relevant, if I may say so, to the point at issue whether this deals with a specific action of this hormone, whether it influences the hormone at all. I would say, quite positively, that it has no effect on the hormone. Therefore, it does not alter the hormone; the hormone then works just as it would work by any route of direction in doing the essential thing which is its hormonic property of changing the skin of the vagina, keratalysing it, and so forth. That is the essence of it. You can precede it by a vinegar douche, or do a variety of things, use all sorts of acid, but that is my opinion, that that is not essential to the hormone activity.

It is our view that we would not be justified, upon the factual record

before us, in holding that the materials combined with, or added to, the imported merchandise to produce the Kolpon Inserts (Exhibit 4) are shown to have a therapeutic use or value which differentiates the inserts therapeutically from the products illustrated by exhibits 2, 3, and 5.

Coming to the question of classification, we first consider the claim under paragraph 1558 which provides for "raw or unmanufactured articles not enumerated or provided for" at a duty rate of 10 per centum ad valorem. This claim was not stressed before us but it is covered by the assignment of errors and referred to in the brief for appellant and we, therefore, pass upon it.

We deem it sufficient to say that the imported product is shown by the evidence hereinabove recited to have been highly processed and it is obvious that upon the established facts it had become much more than a "raw or unmanufactured article." Hence paragraph 1558 has no application.

Before us counsel for appellant placed greatest emphasis upon the claim for classification as a crude drug under paragraph 1669 of the act with consequent free entry. Paragraph 1669 is sometimes referred to as the "crude drug paragraph." It has been before the courts many times, and many times construed. The Customs Court did not discuss the paragraph at any length in its decision of the instant case, nor in its decision of the first case, Protest 95742–K, *supra*, nor did it specifically pass upon it. This doubtless was due to its holding that the merchandise was not classifiable under either of the drug paragraphs (34 or 1669) alternatively claimed in the protest.

The omission is not subject to criticism but, because of the emphasis placed upon it before us, we deem it not improper to say, without elaborate discussion, that even if the merchandise may properly be designated as a drug for tariff purposes it would have to be classified, upon the facts here shown, under paragraph 34 as a drug "advanced in value or condition" rather than under paragraph 1669 as a drug "in a crude state,, not advanced in value or condition." A mere reading of the proof concerning the processing to which the substance was subjected abroad and a consideration of the state to which it had been advanced with respect to its ultimate use are sufficient, we think, to establish that it was not a crude drug within the meaning of paragraph 1669.

So, the issue lies between paragraph 5 and paragraph 34.

Paragraph 5 reads:

All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

It is noted that in the trade agreement with Argentina, the only

class of products designated in paragraph 5 as enacted by the Congress upon which the rate of duty was reduced is that of medicinal preparations.

The pertinent language of paragraph 34 is:

* * * drugs of * * * animal origin * * * which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by * * * any * * * process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, * * *.

That there is a "twilight zone" between medicinal preparations and drugs advanced in value or condition which leads to difficulty in classification has been recognized by the courts for a long period of time, and a number of decisions, to which references are hereinafter made, have been rendered respecting the issue of whether the particular products involved fell within the provision for medicinal preparations or within that for advanced drugs.

The Congress provided a legislative definition of the term "drug" by inserting in paragraph 34 of that act a *proviso* (which was continued in the 1930 act) reading:

That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes.

The application of the *proviso* was the subject of extensive discussion by us in the case of *Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 53, C. A. D. 316.

It may be said that while that legislative definition of "drug" may have simplified to some extent the task of the customs administrative officials and of the courts in cases of classification as between drug paragraphs, it has not proved of any particular aid in distinguishing between drugs and medicinal preparations for tariff purposes. Congress has given no legislative definition of "medicinal preparations"; so, the determination of what constitutes such a preparation has been left for determination to the customs administrative officials, in the first instance, and finally to the courts.

In making their decisions the officials and the courts, as the cases have arisen, have brought the lexicographers with their definitions of pertinent terms to their aid along with any pertinent judicial decisions.

In the instant case, which has no exact counterpart among the adjudicated cases so far as we have found (other than that of the first *Roche-Organon, Inc.* case, Protest 95742–K, *supra*, of which this case is in effect a retrial), the respective parties have introduced testimony, we assume upon the theory that it is expert in character, relative to the proper definition of the phrase "medicinal preparation." Although the courts are not bound by testimony of this character it is not

improper to introduce it and it is sometimes an aid in arriving at a conclusion, but in order to be of aid in a case of the character here under consideration the testimony must amount to something more than a mere expression by the witness of his own individual opinion.

We have quoted already the definitions given by Doctors Shaner and Wolf, and their reasons for believing that the imported merchandise is not a medicinal preparation. While their phraseology differs their testimony is the same in purport.

The testimony of Doctor Shorr on this matter is, in part, as follows:

Q. Would you give us, Doctor, your definition of a medicinal preparation?— A. I would regard a medicinal preparation as one that is capable of exerting the specific effect intended without any alteration in itself.

Q. Now, Doctor, once more basing your answer on the experience you have acquired through your life-time study, your particular aptitude for the study of hormones and ductless glands, your personal knowledge of the exhibits in question and all the other information that you have at hand, would you state that Exhibit 1 at the time of importation is or is not a medicinal preparation?—A. Exhibit No. 1 is, in my opinion, a medicinal preparation in that it fulfills my definition given in my previous statement.

It does not appear from the testimony of the three witnesses that their definitions represented anything other than their individual opinions. They were not asked as to any standard definitions generally recognized by members of the medical profession, nor were they called upon to distinguish between the legislative definition of the term "drug" and the meaning of "medicinal preparation" as that phrase has been adjudicated.

The Customs Court did not indicate in its decision that it attached any particular importance to the definitions advanced by the respective witnesses, although its conclusion was in harmony with the view expressed by Doctor Shorr. The court said, "The question before us concerns the tariff term 'medicinal preparations,' paragraph 5, *supra*, and our consideration of the present case must be directed entirely in the light of judicial interpretation of that term," and after citing different decisions and commenting thereon, it held:

The controlling factors, determinative of the present issue, are that the active principle of the imported estrogenic hormone undergoes no chemical change and is not compounded with other medical ingredients in its ultimate use as a remedy for the conditions described herein, and that the therapeutic properties and medicinal value of the desired estrogenic hormone remain constant from the time of importation, throughout plaintiff's procedure for proper labeling and packing, and until marketed as profitable commercial products. Accordingly, we hold the instant merchandise to be classifiable as a medicinal preparation under paragraph 5, *supra*, as amended, as assessed by the collector.

We should experience little or no difficulty in agreeing with the conclusion of the Customs Court if the claim under paragraph 34 with its clear-cut legislative definition of "drug" were not involved here.

Earlier in this decision we referred to the obvious fact that there is a "twilight zone" between paragraphs 5 and 34 which renders the task of determining classification as between them difficult. The Customs Court expressed the thought we have in mind very happily as follows:

While identical factors—therapeutic qualities and medicinal use—control the tariff classification of merchandise, either as a drug or a medicinal preparation, the very definite difference in treatment accorded the respective products in the tariff act indicates an understanding by Congress that a real distinction between them existed and was intended to be respected. In other words, Congress is presumed to have had good and sufficient factual basis for setting up such separate provisions and to possess in its records and files, making up the Congressional intent, convincing and sound reason therefor.

It seems to us that the imported substance involved here falls within the meaning of medicinal preparation as that phrase has been interpreted by the court, and also falls within the legislative definition of "drug" given in the first *proviso* of paragraph 34, *supra*.

The Customs Court, in fact, so found, saying:

It is clear that the present merchandise possesses therapeutic properties and is used exclusively for medicinal purposes. Hence, it meets requirements for classification, either as a drug or a medicinal preparation.

In determining the question of its classification, however, the Customs Court apparently did not inquire into the relative specificity of the paragraphs involved, but followed the rule or method of distinguishing between drugs and medicinal preparations first announced by it in the case of *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 98, C. D. 803 (decided September 10, 1943, and not appealed), which rule it reiterated in its decision in two other cases (not appealed) between the same parties (See 11 Cust. Ct. 147, C. D. 813, and 12 Cust. Ct. 148, C. D. 845).

To support the rule so laid down, the court, in its different decisions, cited various cases relating to the interpretation of the phrase "medicinal preparations." In the instant case it said: "There is a line of decisions * * * holding merchandise to be medicinal preparations, where it was found that the imported product, possessing therapeutic qualities, was merely diluted or mixed with an inert carrier when administered for its medicinal use," and three cases were cited in support of the principle thus stated, viz: *McKesson & Robbins* v. *United States*, 3 Ct. Cust. Appls. 515, T. D. 33167, which arose under the 1909 tariff act; *United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, T. D. 41706, which arose under the 1922 act; and *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. (Customs) 31, T. D. 47038, which arose under the 1930 act, the court saying: "Thus the uniform statutory construction maintained in the three said cases was carried through three different tariff acts, including the present one under which the instant case arises."

The court, as of course, states correctly the purport of those deci-

sions with respect to the interpretation of the meaning of "medicinal preparations" as the phrase is used in the different acts, but it seems to us that in applying that interpretation in cases where the merchandise falls within either of two definitions it should not be considered as a mere abstract statement, but that there should be a comparison with other paragraphs invoked. In other words, it is necessary to consider the relative specificity of paragraphs where the merchandise might readily find classification under either, were the other not present. This was expressly done in the cases of *Hillier's Son Co.*, *supra*, and *Wm. Cooper & Nephews, Inc.*, *supra*.

In the *McKesson & Robbins* case, *supra*, which, as has been stated, arose under the 1909 tariff act, the merchandise involved is described as menthol. It was classified by the collector as a medicinal preparation not specially provided for. There as here there were alternative claims that it was classifiable (1) as an advanced drug or (2) as a crude drug or (3) as a nonenumerated manufactured article. (In the instant case the third claim was for an *un*manufactured article. Italics ours.)

It appears from the decision in that case that the menthol was sometimes sold and used in its imported condition but its more ordinary use was in forms resulting from processing after importation. Some weight also seems to have been given to the fact that "for a period of 12 years at least" menthol had been classified as a medicinal preparation. It was not provided for *eo nomine* in the act.

The decision states that the importer relied chiefly upon its "crude" drug (duty free) claim for classification under paragraph 529 of the 1909 act which was substantially the same as paragraph 1669 of the 1930 act. Paragraph 20 of the 1909 act constituted its "advanced" drug paragraph, and it was quite similar to paragraph 34 of the present act, except that it did not contain the legislative definition of "drug" nor did that definition, nor any other definition of the term, appear elsewhere in the act. What the court as then constituted would have held, had it been there confronted with that definition, we have no way of ascertaining, but however sound its interpretation of "medicinal preparation," we do not regard the decision as controlling here.

In the *Hillier's Son Co.* case, *supra*, the merchandise consisted of scammony resin which was found to be used exclusively as a medicine, not being used as imported but after being combined with inert carriers following importation.

It was classified by the collector as a medicinal preparation under paragraph 5 of the Tariff Act of 1922, prototype of paragraph 5 of the 1930 act, and was at first claimed by the importer to be entitled to classification under the provision for "resins, not specially provided for," in paragraph 1584 (a free list paragraph) of the act. By amendment to the protest there was also presented a claim under paragraph

34 of the act, prototype of paragraph 34 of the present act, including the legislative definition of the term "drug" *supra*.

The Customs Court sustained the claim made under paragraph 1584 and we reversed. After discussing the meaning of "medicinal preparations" with citation of authorities, including the *McKesson & Robbins* case, *supra*, we held that while the merchandise "is provided for as a 'resin' in paragraph 1584, it is more specifically provided for, we think, as a medicinal preparation in paragraph 5," and cited numerous cases involving relative specificity as a rule of construction.

This court did not in its decision there make any comparison between the meaning of "medicinal preparations" arrived at by interpretation and the legislative definition of the term "drug," the claim under paragraph 34 not being presented in a manner which seemed to require it. Our only comment upon the drug question was to the effect that the record in that case evidently was quite different from the record of a case which arose under the 1897 tariff act wherein the United States Circuit Court sustained the decision of the Board of United States General Appraisers holding scammony resin to be an advanced drug rather than a medicinal preparation. 155 Fed. 264. That act, of course, carried no legislative definition of the term "drug."

In the case of *Wm. Cooper & Nephews, Inc.*, *supra*, the merchandise was "derris resin or extract" which was classified by the collector as a medicinal preparation under paragraph 5 of the Tariff Act of 1930, *supra*. The sole claim of the protests in that case appears to have been that the merchandise was properly classifiable and, therefore, entitled to admission duty free, as a natural resin, not specially provided for, under paragraph 1686 of the act between which and paragraph 1584 of the 1922 act there is some difference which, however, is of no importance here. The Customs Court sustained the importer's claim and we again reversed, applying the rule of relative specificity.

There was no claim by the importer under the "advanced drug" paragraph (34) in that case and it was not considered by the Customs Court. For that reason we refused to consider it when brought forward as an alternative in the Government's assignment of errors on the appeal to us. Our only discussion of the definition of the term "drug" therein was in connection with the requirement of chief use to test the different drug paragraphs of the act, and we held that the same test should be applied to the provision for medicinal preparations contained in paragraph 5, thus reiterating a rule which had been previously proclaimed in various cases.

In the case of *Sherka Chemical Co., Inc.*, *supra*, the merchandise consisted of a potassium oestradiol solution. It was classified by the collector, as stated in his return to the Customs Court, as a nonalcoholic chemical compound, not specially provided for. The im-

porter's protest made alternative claims, all of which were in effect overruled by the Customs Court. We reversed and sustained importer's claim for classification under paragraph 34 as an advanced drug, holding, upon the facts there appearing, that "drug" was more specific than "chemical compounds." Incidentally, it may be said that one of the ingredients in the substance imported in that case was related to the substance here involved, but there was no claim that the product as a whole was a medicinal preparation.

In its decision in the *McKesson & Robbins* case, *supra*, this court cited the case of *Fink* v. *United States*, 170 U. S. 584, and it has been cited and discussed in the instant case. It presents a situation which in principle appears to be similar to the instant case. It arose under the tariff act of October 1, 1890, in which medicinal preparations and chemical salts were provided for in different paragraphs (the former in paragraph 74 and the latter in paragraph 76) and at different rates of duty.

There was an importation of muriate of cocaine which the collector seems to have classified as chemical salts. The importer sought classification as a medicinal preparation. The litigation reached the United States Circuit Court of Appeals for the Second Circuit and that court certified questions to the Supreme Court inquiring whether the merchandise was dutiable under paragraph 74 or paragraph 76.

The answer involved the matter of classification. The Supreme Court said, *inter alia:*

There can be no doubt that the article in question from some points of consideration might be classified under either of the paragraphs of the statute referred to in the certificate. Thus, within the purview of paragraph 74, it is obviously a medical preparation, in the preparation of which alcohol is used. It is also equally clear that it is likewise, chemically speaking, a salt, and hence within the reach of paragraph 76. It would then follow that if either of the paragraphs stood alone in the statute, disembarrassed of the provisions found in the other, the preparation might properly come under the head of either. Being reached, then, in some of its aspects by some of the provisions found in both paragraphs, the question is, which, if either of the two, is so dominant in its control of the article in question as to exclude the operation thereon of the other. The rule is that this, if possible, is to be determined by ascertaining whether one of the two paragraphs is more definite in its application to the article in question than is the other. *Isaac* v. *Jonas*, 148 U. S. 648; *Bogle* v. *Magone*, 152 U. S. 623. Being a medicinal preparation, made as such and solely used as a medicine, the language of paragraph 74 clearly more definitely applies to it than does the generic provision "of chemical compounds and salts" found in paragraph 76. * * * In reason the result of the certified facts is simply this, that muriate of cocaine is in its narrow aspect a medicinal preparation, in its wider a chemical salt, and hence that chemical salt is a generic term designating all articles of that character, and hence embracing muriate of cocaine as the genus, must as a matter of course contain within itself the species which are embodied in it.

It is our view that "medicinal preparations" as used in paragraph 5, *supra*, is a generic term. It includes drugs as the latter term is

legislatively defined, but it is broader in scope than drugs, just as in the *Fink* case, *supra*, it was narrower in scope than chemical salts. The Supreme Court defined chemical salts as a "genus" containing medicinal preparations "within itself" as a "species," and held the tariff provision for the species to be more definite than that for the genus. In the instant case we regard "medicinal preparations" as being the genus and "drugs" as being the species.

It is not questioned that the imported substance meets squarely every requirement of paragraph 34, including the legislative definition of drug. It is of animal origin; is natural and uncompounded, is not edible, is advanced in condition; has therapeutic or medicinal properties; is chiefly used for medicinal purposes, and contains no alcohol. It seems to us that the paragraph is more definite in its application to the substance than paragraph 5 and that it should have been classified accordingly, with duty assessment at 10 per centum ad valorem.

For the reasons stated, the judgment of the Customs Court is *reversed* and the case is *remanded* for further proceedings consistent with this decision.

BLAND, Judge, sat during the argument of this case, but resigned before the opinion was prepared.